**CHEMICALS RECOVERY CO., Inc. v. UNITED STATES.**

No. 49500.

United States Court of Claims.

April 8, 1952.

James M. Proctor, Jr., Washington, D. C., Kirlin, Campbell & Keating, New York City, Robert E. Kline, Jr., and R. A. Capone, Washington, D. C., on the briefs, for plaintiff.

Bruce G. Sundlun, Washington, D. C., Asst. Atty. Gen., Holmes Baldridge, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

MADDEN, Judge.

The Chemical Corps of the War Department in October 1947 had for sale some 6,500,000 M5 protective ointment kits, left over from World War II. The contents of these kits were for the protection of soldiers against poison gas. The plaintiff was invited to bid for the kits, but its bid was rejected as being too low. Then, on November 7, 1947, the plaintiff was invited to submit a proposal on the basis of which a contract might be negotiated. The plaintiff offered $70,000 for the lot. The Government then drafted a contract for the purchase, removal, and "demilitarization" of the kits. On December 15 it sent copies of the contract to the plaintiff for execution. These copies were not signed by the Government, and were not dated. The plaintiff signed them on January 2, 1948,

and returned them, together with the initial payment of $7,000 required by the contract. The contract also required a performance bond in the amount of $25,000, but the plaintiff did not send that in with the contract and the $7,000. The Government, on January 20, and again on February 11, requested that the bond be supplied. On March 1 the plaintiff replied that it was having difficulty obtaining the bond from a bonding company; that to put up the $25,000 in cash would deplete its working capital unduly; but that it would on getting a report from its chemist within a few weeks as to the possibility of making a profitable disposition of some of the elements in the ointment contained in the kits, again take up the matter of the bond.

About March 15, 1948, the plaintiff regretted having made the proposal for the purchase of the kits, and desired to get back its $7,000. The Government had not yet signed the contract. The plaintiff advised the Government that it wished to withdraw its offer. However, on April 23 the plaintiff received by mail a copy of the contract, fully executed, but undated. The plaintiff continued in May, June, and July to seek to withdraw from the transaction. On August 26 the Government's contracting officer wrote the plaintiff that the removal of the kits was to have commenced within four months from the date of execution of the contract; that the warehouse space was urgently needed; and that failure to remove the kits would result in forfeiture of the $7,000 which the plaintiff had already paid. The letter then said:

"However it is expected that your firm can remove the 550,000 kits by 23 September 1948.

"The arrangements you make for the removal of the kits should be preceded by the receipt in this office of the bond as required by Article 23 of the Contract."

The contract provided for the removal of 550,000 kits per month, the removal to begin four months after the date of the contract. The September 23 date was, no doubt, based upon the fact that the plaintiff had received on April 23 his copy of the contract signed by the Government, and thus the four months' period, at the end of which removal should begin, ended on August 23.

The plaintiff began, late in August, to negotiate with Metals Recovery Company for the resale of the kits to that company. On August 30, Mr. Crossley, an official of the plaintiff, telephoned to Colonel Greene, who acted for the Government in the matter, asking if arrangements could be made whereby the kits could be "broken down", that is, separated into their component parts of metals, ointment, cloth and paper in the Government's warehouses where the kits were stored, and if the performance bond could be eliminated or reduced if the plaintiff paid cash in advance for all the kits. Colonel Greene said he would investigate to see what could be done. On September 2d or 3d Mr. Crossley telephoned again to find out what had been done about his requests, and told Colonel Greene that the plaintiff was negotiating for the resale of the kits. On September 9, a Mr. Sharp, an official of the plaintiff who thereafter acted for it in the transaction, called Colonel Greene and asked for two more concessions in addition to the two formerly requested by Mr. Crossley. These were (1) an extension of time to October 23 in which to remove the first month's quota of kits, and (2) that title to the kits pass to the plaintiff upon payment of cash in advance for all the kits, rather than when they were removed from the warehouse. Colonel Greene said he would seek legal advice on the problems of the bond and the passing of title, that he would ascertain whether the warehouse space for the breaking down of the kits could be made available on a rental basis, and that he himself had authority to grant the extension of time.

On September 12 the plaintiff entered into a written agreement with Metals Recovery, whereby that company bought the kits from the plaintiff for $100,000 and agreed to do all the things which the plaintiff had, in its contract with the Government, agreed to do. On September 14

Mr. Sharp again discussed the four requested changes with Colonel Greene. He told Colonel Greene that he had $45,000 which he would try to deliver to him in person.

On September 14 the Chief of the Chemical Corps requested that the status of the kits be determined, and that they be withdrawn from sale if that was possible.

On September 16, Mr. Sharp telephoned Colonel Greene that he had not been able to carry the money to him by hand, but he read to him a letter, which he had prepared, which said that it contained a certified check for $45,000; that this would leave an unpaid balance of only $18,000 on the $70,000 purchase price; that the plaintiff was anxiously awaiting Colonel Greene's advice as to whether the requested changes in the contract would be approved. Colonel Greene asked Mr. Sharp not to send the proposed letter, but instead to write a letter stating clearly the plaintiff's position concerning the contract. Also on September 16, Mr. Sharp talked to a Mr. Fredericks, the legal adviser of the Salvage Section of the Chemical Corps, about the performance bond. Mr. Fredericks explained that even though the purchase price was paid in cash, the performance bond still had a purpose, since the purchaser was required to demilitarize the kits to the Government's satisfaction. Mr. Fredericks suggested that the plaintiff use $25,000 of the $45,000 which it was offering to pay on the purchase price as a cash performance bond.

After these conversations with Colonel Greene and Mr. Fredericks on September 16, Mr. Sharp sent a letter to Colonel Greene which is quoted in full in Finding 27. Its first two paragraphs said:

"Without changing our position in any respect to the above numbered contract, I should like to advise you that if we could obtain certain amendments and changes in the contractual proposal as it now stands, we would be willing to make immediate payment of $45,000 on the contract and to pay the entire balance not later than September 30, 1948.

"For us to successfully work this out on this basis, we should like the following changes in the contract and the following arrangements with respect to facilities: * * *".

The letter then described the four changes which had been discussed before. It said that if they were agreed to, the entire $70,000 would be paid by September 30.

On September 20 Mr. Sharp called Colonel Bacon, legal adviser to the Chief of the Chemical Corps, in an effort to get a prompt decision about the waiver of the performance bond and the passage of title. Colonel Bacon told Mr. Sharp that he had just advised Colonel Greene that the plaintiff was in default. Colonel Bacon refused to discuss the matter further, and said Mr. Sharp should call Colonel Greene. He was unable to reach him on that day, but made an appointment for an interview on the next day, September 21st. On that day he met with Colonel Greene and Mr. Fredericks, and was told by Colonel Greene that his legal advisers were of the opinion that the contractor was in default. Mr. Sharp expressed surprise, said he had been under the impression that Colonel Greene had extended the time for the removal of the first lot of kits to October 23, but that if that was not so he was still ready to remove them by September 23. He then tendered to Colonel Greene a certified check for $45,000 and a letter which said that if the Government was not willing to waive the performance bond it might use $25,000 of the money as a cash bond. It again suggested the desirability of allowing the kits to be broken down at the warehouses, which would be done, if permitted, within four or five months instead of the twelve months which the contract allowed, and of extending the time for the removal of the first lot of kits to October 23.

Colonel Greene refused to accept the check and asked Mr. Fredericks to explain the Government's position. Mr. Fredericks stated that the Government considered the plaintiff in default for failure to furnish a bond; that it thought there was not sufficient time left before Sep-

tember 23 to remove the initial quantity of kits; and that in its letter of September 16 the plaintiff had reverted to its original position that no contract existed. He then suggested that the plaintiff enter into a voluntary termination of the contract by means of which it could recover its initial payment of $7,000. The plaintiff did not accept this proposal.

On September 22, agents of the plaintiff went to the Edgewood warehouse and requested permission to begin removing the kits. Colonel Greene refused permission, on the ground that the contractor was in default. Mr. Fredericks gave the plaintiff's agent a letter, stating the same reason for refusal, and returning the plaintiff's check for $45,000. On September 23 the plaintiff tendered an additional check for $18,000 which the Government returned to the plaintiff on September 27. By a letter of October 11, the Government's position was reaffirmed. The plaintiff appealed to the Army Board of Contract Appeals which denied its claim by a decision dated September 23, 1949. About October 31, 1949, the Government returned the plaintiff's initial deposit of $7,000.

From the above facts, we arrive at certain legal conclusions. A contract was made on April 23, 1948, at which time the plaintiff received a copy of the document, signed by the Government. For several months the plaintiff denied the existence of the contract, and requested the return of its $7,000. During this time the Government could have treated the plaintiff's expressions as an offer to a voluntary rescission, returned the $7,000 and cleared the slate. It did not do so but insisted on holding on to its contract, which it had a right to do. On August 26, three days after the beginning of the first month of performance it made that position clear. It also made clear that removal of the first month's quota of kits by September 23 would be regarded as performance, and that the filing of the performance bond at any time before the removal of any kits would be satisfactory. The plaintiff thereupon, being unable to escape from its contract, set about to find a market for the

kits, and soon became involved in a contract with Metals Recovery. It desired certain changes in its contract with the Government, which changes would have been advantageous to it, and some of them would have been advantageous to the Government. It asked for them, as it had a right to do, though it had no right to obtain them. Assuming that the Government was still anxious to get performance, the plaintiff maintained its position that it was not bound by the contract, apparently for the purpose of inducing the Government to agree to the proposed changes in order to get the plaintiff to perform. At this stage, early in September, when the plaintiff was arranging its resale to Metals Recovery at a considerable profit, it could not really have desired to escape from the contract. And after September 12, when it had formally and unconditionally agreed to resell the kits to Metals Recovery, it of course did not so desire. At that time, then, both the Government and the plaintiff desired performance of the contract, but the plaintiff desired modifications in it, and the Government was considering the modifications. But on September 14 the Government lost its desire for performance, because the Chief of the Chemical Corps requested that the kits be withdrawn from sale if that was possible. On September 16, when the plaintiff proposed to pay $45,000, which was much more than was due, and to by letter request an immediate decision as to its requested modifications of the contract, but to say nothing about the previously asserted invalidity of the contract, Colonel Greene persuaded the plaintiff to withhold its tender and state in detail in writing its position with reference to the contract. Thereupon the plaintiff wrote a letter which might well have proved its undoing. We have quoted its first two paragraphs. It was written on the assumption that the Government was still anxious for performance and that the plaintiff could still use its contention that the contract was invalid as a lever to obtain the modifications in the contract which it desired. But the Government, of course, no longer

wanted performance. It wanted to keep the kits. If it had replied to the plaintiff's letter saying that the plaintiff's reassertion of the invalidity of the contract was regarded as an offer of rescission; that the offer was accepted; the $7,000 payment was returned and the transaction was closed; the plaintiff would, apparently, have been out. But the Government did not so treat the plaintiff's letter. Instead, it asserted that the plaintiff was in default in its performance and for that reason it had no further rights under the contract. The plaintiff was not in default, and the Government's attempted forfeiture for that reason was ineffective and the contract still stood. Thereupon the plaintiff immediately tendered unconditional performance, thereby withdrawing any outstanding offer of mutual rescission. This tender was refused, and thereupon the Government breached its contract.

We have said that the plaintiff tendered unconditional performance. It tender of $25,000 in cash as a performance bond complied with the Government's statement in its letter of August 26, when it said that the bond must be furnished before any kits were removed. When the plaintiff was notified by Colonel Bacon on September 20 that it was in default, there was still time for it to remove the 550,000 kits by September 23. The declaration of default was premature, even if the Government had had the right, which we think it did not have, to negotiate with the plaintiff down to this late date about an extension of time, and the use of its warehouses for demilitarizing the kits and then, at the eleventh hour and too late, as it claimed, for the plaintiff to make up for the time lost in negotiation, summarily forfeit the contract. In addition there is not the slightest indication that a delay of a day or two in removing this small fraction of the total number of kits would have prejudiced the Government, to the extent that it could forfeit a contract for this violation of its letter, if in fact it had proved impossible to remove the kits by September 23.

The Government urges that the plaintiff's resale of the kits to the Metals Recovery Company had the effect of authorizing the Government to annul the plaintiff's contract with the Government, under the provisions of 41 U.S.C.A. § 15, R.S. § 3737. This statute, in its pertinent part says:

"No contract or order, or any interest therein, shall be transferred by the party to whom such contract or order is given to any other party, and any such transfer shall cause the annulment of the contract or order transferred, so far as the United States are concerned. * * *"

The question whether this statute is applicable is a troublesome one. In Colonel Greene's negotiations with the plaintiff he was fully aware that the plaintiff was reselling the kits to a third party, and was not disturbed by that fact. In giving reasons to the plaintiff why they were declaring a default, the Government's officers made no mention of the resale, nor any inquiry as to its terms. They did not, of course, know the exact terms of the resale, but there was nothing in them which would not have been expected, if a resale was permissible at all. The terms were that the plaintiff required Metals Recovery to agree to do, subject to the inspection of the plaintiff and the Government, what the plaintiff had agreed with the Government to do by way of demilitarizing the kits. The contract certainly contemplated that the plaintiff might use employees in doing this work. It expressly mentioned the possibility of subcontractors being used in the performance of the contract. There was then nothing in the nature of the contract which called for its personal performance by one or more individuals. But the policy expressed by the nonassignment statute quoted above is, no doubt, broader than the general rule of contract law requiring personal performance of some types of contracts.

The statute is difficult to construe and apply. Broadly construed, it would mean that if one bought surplus assets from the Government and agreed to take delivery of them at a specified time and place, and then resold the articles to another who called for the articles with his trucks, at

the right time and place, the Government could, if it had changed its mind in the meantime about selling the property, annul the contract and keep the property. But there would be no reason in such a construction of the statute. It was apparently meant to apply to situations where one person contracts with the Government to, for example, build a ship or a bridge or to manufacture uniforms, and then assigns to another the right and the duty to perform the contract and receive the money which the Government has agreed to pay. A person not contractually bound to the Government would, if permitted, enter into performance of the contract, and the Government's dealings, with regard to supervision, inspection, etc., would be with him, and not with the contractor. This would give rise to the evils mentioned by the Supreme Court of the United States in Hobbs v. McLean, 117 U.S. 567, 576, 6 S.Ct. 870, 874, 29 L.Ed. 940, where it was said that the statute here in question was "passed in order that the government might not be harassed by multiplying the number of persons with whom it had to deal, and might always know with whom it was dealing until the contract was completed and a settlement made."

In the instant case, the possibility of any such complications was slight. The plaintiff was bound to pay for the kits on delivery, and, indeed, tendered payment far in advance of delivery. The plaintiff was bound to demilitarize the kits, to the satisfaction of the Government, on penalty that the title to them would revert to the Government if that was not done. It would in any event have had to use employees to do that. It could have used a subcontractor to do it. It could not and by its resale did not attempt to escape its responsibility to the Government to see that it was done. Whether it was done by a third person as an employee, or as a subcontractor, or as a person who had bought the kits from the plaintiff subject to the Government's right to resume title to them if they were not properly demilitarized would not seem to have made any practical difference.

In Stout, Hall & Bangs v. United States, 27 Ct.Cl. 385, this Court said:

"In all of these facts there is no evidence of an attempt to assign the contract. Plaintiffs adopted business methods which suited them in carrying out their engagements; they did not seek to avoid responsibility to the government, or to place another contractor in their place. A contractor has a right to make subcontracts; * * *. He must not attempt to transfer his responsibility to the government; * * *. But he has a perfect right to fulfill his contract duties in the business manner which best pleases him, provided he retain his personal responsibility and achieve the required result."

We are probably influenced in our construction of Section 15, and in our refusal to apply it to the instant situation by the general doctrine that equity abhors forfeitures, and by the fact that the Government's reliance upon the statute is a mere afterthought. Though attempting to marshal all available reasons for forfeiting the plaintiff's contract, this one never suggested itself to the Government's officers until long after they had refused to perform the contract.

Leave is granted the plaintiff to amend paragraph 4 of its petition so that it will allege that the dates for beginning and completion of the removal of the kits were August 23, 1948, and September 23, 1948, respectively.

The instant phase of the litigation is limited, under permission granted by the court under Rule 39(b), 28 U.S.C.A., to the question of the Government's liability to the plaintiff. No evidence was received on the question of the amount of the plaintiff's damage. Our conclusion is that the Government is liable to the plaintiff. This case is referred to a Commissioner of this court for hearings on the question of damages, and report.

It is so ordered.

JONES, Chief Judge, and HOWELL, WHITAKER, and LITTLETON, Judges, concur.