Julia A. McPHAIL and M. G. Montoya, Jr., Julia A. McPhail for the use of Herself and of M. G. Montoya, Jr.,

v.

UNITED STATES.

No. 128–56.

United States Court of Claims.

March 2, 1960.

K. Norman Diamond, Washington, D. C., for plaintiffs Stuart J. Land and Arnold, Fortas & Porter, Washington, D. C., were on the briefs.

Lawrence S. Smith, Washington, D. C., with whom was Asst. Atty. Gen., George Cochran Doub, for defendant.

WHITAKER, Judge.

Plaintiffs sue for damages, including out-of-pocket expenses and loss of profits, which they say resulted from defendant's refusal to allow plaintiffs to perform a contract duly entered into between the parties. The Government defends, first, on the ground that there was no valid contract between it and the plaintiffs; and, second, that even if there was a valid contract, the contract was annulled pursuant to 41 U.S.C.A. § 15[1] when plaintiffs transferred an interest therein to another party.

The alleged contract in suit was to furnish meals to Mexican laborers who were brought into this country by the Farm Placement Service of the Department of Labor. Under this program, Mexican farm workers were used to supplement domestic labor where shortages were known to exist. On entering the United

[1] Section 15 of Title 41 U.S.C.A. provides, in pertinent part, as follows:
"No contract or order, or any interest therein, shall be transferred by the party to whom such contract or order is given to any other party, and any such transfer shall cause the annulment of the contract or order transferred, so far as the United States are concerned."

State the laborers were sent to reception centers operated by the defendant's agent at Hidalgo, Texas, Eagle Pass, Texas, El Paso, Texas, Nogales, Arizona, and El Centro, California, where they were quartered overnight and furnished one to three meals before going to the farms where they were to be employed.

On May 11, 1955, pursuant to this program, the Department of Labor issued an invitation for bids to furnish all the meals required at one or more of the five reception centers for the fiscal year 1956. The invitation was a complete document which embraced not only the invitation, but the bid and the award to be executed and the terms and provisions of the contract to be entered into.

Plaintiffs McPhail and Montoya obtained an invitation and submitted a bid under the name of plaintiff McPhail prior to the opening date specified in the invitation. For the most part, the bid substantially complied with all the requirements stated in the invitation. The only material deviation concerned the price plaintiffs contemplated charging for "Box lunch with drink" and "Box lunch without drink." In completing the bid from plaintiffs stated the price to be charged for each meal to be supplied as follows:

| | Hidalgo, Tex. | Eagle Pass, Tex. | El Paso, Tex. | El Centro, Calif. | Nogales, Ariz. | Blanket bid, all centers |
|---|---|---|---|---|---|---|
| Breakfast....... | 22 cents.. | 22 cents.. | 22 cents.. | 22 cents.. | 22 cents.. | |
| Dinner......... | 22 cents.. | 22 cents.. | 22 cents.. | 22 cents.. | 22 cents.. | |
| Supper......... | 22 cents.. | 22 cents.. | 22 cents.. | 22 cents.. | 22 cents.. | |
| Box lunch with drink.......................................................... | | | | | | |
| Box lunch without drink—fifteen per cent plus........................ | | | | | | |

When the 15 bids for the contract were opened on May 27, 1955, it was found that plaintiffs' bid was the lowest for the three hot meals, but it was noted that plaintiffs offered no bid on the item "Box lunch with drink", and that the bid of "fifteen per cent plus" on the item "Box lunch without drink" was ambiguous. After discussion, it was decided that a Mr. Paul, an agent of the defendant, should telephone plaintiff McPhail to obtain a clarification of the bid. This was done on May 31, 1955. Plaintiff McPhail explained the bid with reference to paragraph 17 of the contract specifications which read as follows:

"17. When requested to do so by an employer of Mexican workers and subject to the approval of the Manager, the contractor shall provide and sell to such employer hot meals which shall be of the same quantity and quality as are provided for in this contract at the contract price shown herein. Box lunches prepared by the Contractor at the center for the account of the contractor and of the same quantity and quality as are provided for in this contract may be sold to the employer at a rate not to exceed 15% higher than the contract price shown herein, rounded to the next higher cent. It is understood that the Government will bear no responsibility for any billings, payment or collection involved in this paragraph."

She understood this provision to mean that the bidder's quotation for box lunches could not exceed the price quoted for the hot meals by more than 15 per cent, plus the actual cost of the drink. Mr. Paul then asked her to send a telegram to the Department of Labor submitting price quotations on the box lunch items and supplying information concerning

her financial resources and credit references. This was done by the plaintiffs on the following day.

All 15 bids submitted were then reviewed by the Foreign Labor Division of the Department. It was recommended by this division that the contract be awarded to plaintiffs solely on the basis of being the low bidder. It was further recommended that due to the short time remaining before the date of performance that the contract award be made immediately. In the light of this recommendation, on June 2, 1955, the defendant's authorized agent, a Mr. Demorest, sent the following telegram of acceptance:

"Your bid for furnishing meals at Hidalgo Texas, Eagle Pass Texas, El Paso Texas, Nogales Arizona and El Centro Calif reception centers has been accepted by the Government subject to receipt of your performance bond in the amount of $45,000 covering all centers on or before June 10 in this office."

On June 6, 1955, Mr. Hersey, the contracting officer in charge of this contract, returned to duty in Washington. He has been absent during all the events described above, during which time Mr. Demorest had been authorized to act for him. Upon learning the facts about the plaintiffs' bid and its subsequent clarification by telephone, Mr. Hersey decided that the bid as originally submitted was incomplete and unresponsive and he doubted if a contracting officer had authority to accept a bid which had been modified after the opening of the bids. After consultation, he decided to seek advice of the Comptroller General as to the authority of the contracting officer to accept a bid on the facts presented.[2]

On June 8, 1955, Hersey placed a long distance call to plaintiff McPhail to advise her not to incur any expenses pending a determination of the validity of the contract award. Plaintiff McPhail was not at home, but Mr. Hersey agreed to talk to her husband, Mr. McPhail, who said he would deliver the message to his wife. In his conversation, Mr. Hersey referred to the modification of plaintiffs' bid and stated that in his opinion his office lacked authority to accept such a telegraphic modification, and that the problem had been referred to the Comptroller General. Mr. Hersey also told Mr. McPhail to disregard that part of the acceptance telegram which related to the filing of the bond until a decision was made on the contract's validity. It is apparent from the evidence that Mr. McPhail did not fully understand the import of this conversation and the effect of the Comptroller General's opinion on the validity of his wife's bid.

On June 10, 1955, the contracting officer received a telegram from plaintiff McPhail stating that the posting of the bond was being postponed because of the telephone conversation of June 8 "pending on my receiving the papers you need my signature for on the box lunches." However, the next day, June 11, the Department of Labor received a telegram from an agent of Royal Indemnity Company stating that it had executed a performance bond in the sum of $45,000 for plaintiffs on the contract.

No further communications took place between plaintiffs and defendant until June 20, 1955. On June 17, the Comptroller General advised the Secretary of Labor that plaintiffs' original bid was not complete and responsive and that to permit plaintiffs to complete and explain the bid would give an unfair advantage. In the light of this report, the contracting officer called plaintiff McPhail by telephone and informed her that the defendant's telegram of acceptance was invalid and that there was no contract between the parties.

The Government's first defense, namely, that there was no valid contract between the parties, is based on the theory that the bid modification was contrary to the provisions of 41 U.S.C.A. § 5 (1958),

2. In submitting the facts to the Comptroller General, the Department of Labor failed to state that it had accepted the plaintiffs' bid, as explained and completed.

which requires that Government contracts may be made "only after advertising a sufficient time previously for proposals." The defendant says that the plaintiffs' modified bid was in fact a new proposal presented without previous advertisement.

We are inclined to think that a valid contract was consummated, but we do not decide that question because, assuming that there was a valid contract, we think it was annulled by the agreement entered into between plaintiffs and Manuel B. Toledo.

Upon receipt of the telegram from defendant's agent accepting their bid, plaintiffs immediately attempted to secure financial assistance from various sources without success, but on June 9 or 10, 1955, they met with one Manuel B. Toledo, who had had considerable previous experience in feeding Mexican laborers. Mr. Toledo promised to assist in financing plaintiffs to the extent of accommodating them with his signature on a note of $12,000 to the First National Bank of Albuquerque. In return for this assistance, plaintiffs and Toledo entered into a contract, designated as a "Management Agreement." The pertinent parts of this agreement are set out in Finding 19.

Under this contract, plaintiffs employed Toledo "to operate and manage" the feeding centers and all business related thereto resulting from the contract with the United States. Toledo was given the power to purchase and sell all property connected with the business; to sign, accept, and endorse all notes, drafts and bills; to sue, collect, compromise and settle all claims; and in general to do all things which he (Toledo) "may consider useful or necessary" in the operation of the business. To carry out this transfer of powers to Toledo, plaintiffs appointed him "their true and lawful attorney * * * to execute in and under their name any and all instruments of whatever nature * * * [Toledo] may deem useful or necessary for the business."

The agreement further provided that all monies received under the contract with the United States should be paid into a bank account under Toledo's complete control. No money would be paid to plaintiffs until such time as Toledo saw fit. The agreement contemplated that ultimately the profits would be divided in half, 50 per cent to plaintiffs, and the remainder to Toledo.

The defendant says that this so-called "Management Agreement" was a transfer of an interest in the Government's contract which resulted in the annulment of that contract pursuant to 41 U.S.C.A. § 15.

The statute cited presents a difficult problem of construction. The Supreme Court in Hobbs v. McLean, 117 U.S. 567, 576, 6 S.Ct. 870, 874, 29 L.Ed. 940, said that the statute in question, which was originally codified as section 3737 of the Revised Statutes, was "passed in order that the government might not be harassed by multiplying the number of persons with whom it had to deal, and might always know with whom it was dealing until the contract was completed and the settlement made." The courts, however, have consistently held that the statute does not apply where the contractor enters into a partnership agreement with another to share the profits and the losses under the Government contract, Hobbs v. McLean, supra, and Field v. United States, 16 Ct.Cl. 434, or where the contractor merely subcontracts his duty to the Government. Chemicals Recovery Co. v. United States, 103 F.Supp. 1012, 122 Ct.Cl. 166. The rationale of these cases is clear. So long as the contractor remains primarily liable to the Government and retains the power to perform his duty under the contract, or to require its performance, the statute should not apply, since the Government is not being forced to deal with a stranger to accomplish its purpose.

In the instant case, however, the plaintiffs contracted away their right to perform their contract with the defendant and their power to require its per-

formance. Under their agreement with Mr. Toledo, Toledo was given all the powers necessary for performance, and plaintiffs retained no right to control Mr. Toledo's actions, since they gave him power of attorney to act in their place and stead. In such a situation, the Government, to obtain effective performance of the contract, would be forced to deal with Mr. Toledo since the plaintiffs had rendered themselves powerless to give any satisfaction. All dealings with regard to supervision, inspection, etc., had to be with him, and not with the contractor. We believe that it was precisely this type of transfer which is prohibited by 41 U.S.C.A. § 15, and we so hold.

The plaintiffs' petition is dismissed.

It is so ordered.

JONES, Chief Judge, and LARAMORE and MADDEN, Judges, concur.