WhitaKER, Judge,
delivered the opinion of the court:
Plaintiffs sue for damages, including out-of-pocket expenses and loss of profits, which they say resulted from defendant’s refusal to allow plaintiffs to perform a contract duly entered into between the parties. The Government defends, first, on the ground that there was no valid contract between it and the plaintiffs; and, second, that even if there *180 was a valid contract, the contract was annulled pursuant to 41 U.S.C. § 15[1] when plaintiffs transferred an interest therein to another party.
The alleged contract in suit was to furnish meals to Mexican laborers who were brought into this country by the Farm Placement Service of the Department of Labor. Under this program, Mexican farm workers were used to supplement domestic labor where shortages were known to exist. On entering the United States the laborers were sent to reception centers operated by the defendant’s agent at Hidalgo, Texas, Eagle Pass, Texas, El Paso, Texas, Nogales, Arizona, and El Centro, California, where they were quartered overnight and furnished one to three meals before going to the farms where they were to be employed.
On May 11, 1955, pursuant to this program, the Department of Labor issued an invitation for bids to furnish all the meals required at one or more of the five reception centers for the fiscal year 1956. The invitation was a complete document which embraced not only the invitation, but the bid and the award to be executed and the terms and provisions of the contract to be entered into.
Plaintiffs McPhail and Montoya obtained an invitation and submitted a bid under the name of plaintiff McPhail prior to the opening date specified in the invitation. For the most part, the bid substantially complied with all the requirements stated in the invitation. The only material deviation concerned the price plaintiffs contemplated charging for “Box lunch with drink” and “Box lunch without drink.” In completing the bid form plaintiffs stated the price to be charged for each meal to be supplied as follows:

*181 When the 15 bids for the contract were opened on May 27, 1955, it was found that plaintiffs’ bid was the lowest for the three hot meals, but it was noted that plaintiffs offered no bid on the item “Box lunch with drink”, and that the bid of “fifteen per cent plus” on the item “Box lunch without drink” was ambiguous. After discussion, it was decided that a Mr. Paul, an agent of the defendant, should telephone plaintiff McPhail to obtain a clarification of the bid. This was done on May 31,1955. Plaintiff McPhail explained the bid with reference to paragraph 17 of the contract specifications which read as follows:
17. When requested to do so by an employer of Mexican workers and subject to the approval of the Manager, the contractor shall provide and sell to such employer hot meals which shall be of the same quantity and quality as are provided for in this contract at the contract price shown herein. Box lunches prepared by the Contractor at the center for the account of the contractor and of the same quantity and quality as are provided for in this contract may be sold to the employer at a rate not to exceed 15% higher than the contract price shown herein, rounded to the next higher cent. It is understood that the Government will bear no responsibility for any billings, payment or collection involved in this paragraph.
She understood this provision to mean that the bidder’s quotation for box lunches could not exceed the price quoted for the hot meals by more than 15 per cent, plus the actual cost of the drink. Mr. Paul then asked her to send a telegram to the Department of Labor submitting price quotations on the box lunch items and supplying information concerning her financial resources and credit references. This was done by the plaintiffs on the following day.
All 15 bids submitted were then reviewed by the Foreign Labor Division of the Department. It was recommended by this division that the contract be awarded to plaintiffs solely on the basis of being the low bidder. It was further recommended that due to the short time remaining before the date of performance that the contract award be made immediately. In the light of this recommendation, on June 2, 1955, the defendant’s authorized agent, a Mr. Demorest, sent the following telegram of acceptance:
*182 TOUR BID FOR FURNISHING MEALS AT HIDALGO TEXAS, EAGLE PASS TEXAS, EL PASO TEXAS, NOGALES ARIZONA AND EL CENTRO CALIF RECEPTION CENTERS HAS BEEN ACCEPTED BT THE GOVERNMENT SUBJECT TO RECEIPT OF TOUR PERFORMANCE BOND IN THE AMOUNT OF $45,000 COVERING ALL CENTERS ON OR BEFORE JUNE 10 IN THIS OFFICE.
On June 6, 1955, Mr. Hersey, the contracting officer in charge of this contract, returned to duty in Washington. He had been absent during all the events described above, during which time Mr. Demurest had been authorized to act for him. Upon learning the facts about the plaintiffs’ bid and its subsequent clarification by telephone, Mr. Hersey decided that the bid as originally submitted was incomplete and unresponsive and he doubted if a contracting officer had authority to accept a bid which had been modified after the opening of the bids. After consultation, he decided to seek advice of the Comptroller General as to the authority of the contracting officer to accept a bid on the facts presented.[2]
On June 8, 1955, Hersey placed a long distance call to plaintiff McPhail to advise her not to incur any expenses pending a determination of the validity of the contract award. Plaintiff McPhail was not at home, but Mr. Hersey agreed to talk to her husband, Mr. McPhail, who said he would deliver the message to his wife. In his conversation, Mr. Hersey referred to the modification of plaintiffs’ bid and stated that in his opinion his office lacked authority to accept such a telegraphic modification, and that the problem had been referred to the Comptroller General. Mr. Hersey also told Mr. McPhail to disregard that part of the acceptance telegram which related to the filing of the bond until a decision was made on the contract’s validity. It is apparent from the evidence that Mr. McPhail did not fully understand the import of this conversation and the effect of the Comptroller General’s opinion on the validity of his wife’s bid.
On June 10, 1955, the contracting officer received a telegram from plaintiff McPhail stating that the posting of the bond was being postponed because of the telephone conversa *183 tion of June 8 “pending on my receiving the papers you need my signature for on the box lunches.” However, the next day, June 11, the Department of Labor received a telegram from an agent of Poyal Indemnity Company stating that it had executed a performance bond in the sum of $15,000 for plaintiffs on the contract.
No further communications took place between plaintiffs and defendant until June 20, 1955. On June 17, the Comptroller General advised the Secretary of Labor that plaintiffs’ original bid was not complete and responsive and that to permit plaintiffs to complete and explain the bid would give an unfair advantage. In the light of this report, the contracting officer called plaintiff McPhail by telephone and informed her that the defendant’s telegram of acceptance was invalid and that there was no contract between the parties.
The Government’s first defense, namely, that there was no valid contract between the parties, is based on the theory that the bid modification was contrary to the provisions of 41 U.S.C. § 5 (1958), which requires that Government contracts may be made “only after advertising a sufficient time previously for proposals.” The defendant says that the plaintiffs’ modified bid was in fact a new proposal presented without previous advertisement.
We are inclined to think that a valid contract was consummated, but we do not decide that question because, assuming that there was a valid contract, we think it was annulled by the agreement entered into between plaintiffs and Manuel B. Toledo.
Upon receipt of the telegram from defendant’s agent accepting their bid, plaintiffs immediately attempted to secure financial assistance from various sources without success, but on June 9 or 10, 1955, they met with one Manuel B. Toledo, who had had considerable previous experience in feeding Mexican laborers. Mr. Toledo promised to assist in financing plaintiffs to the extent of accommodating them with his signature on a note of $12,000 to the First National Bank of Albuquerque. In return for this assistance, plaintiffs and Toledo entered into a contract, designated as a *184 “Management Agreement.” The pertinent parts of this agreement are set out in Finding 19.
Under this contract, plaintiffs employed Toledo “to operate and manage” the feeding centers and all business related thereto resulting from the contract with the United States. Toledo was given the power to purchase and sell all property connected with the business; to sign, accept, and endorse all notes, drafts and bills; to sue, collect, compromise and settle all claims; and in general to do all things which he (Toledo) “may consider useful or necessary” in the operation of the business. To carry out this transfer of powers to Toledo, plaintiffs appointed him “their true and lawful attorney * * * to execute in and under their name any and all instruments of whatever nature * * * [Toledo] may deem useful or necessary for the business.”
The agreement further provided that all monies received under the contract with the United States should be paid into a bank account under Toledo’s complete control. No money would be paid to plaintiffs until such time as Toledo saw fit. The agreement contemplated that ultimately the profits would be divided in half, 50 per cent to plaintiffs, and the remainder to Toledo.
The defendant says that this so-called “Management Agreement” was a transfer of an interest in the Government’s contract which resulted in the annulment of that contract pursuant to 41 U.S.C. § 15.
The statute cited presents a difficult problem of construction. The Supreme Court in Hobbs v. McLean, 117 U.S. 567, 576, said that the statute in question, which was originally codified as section 8787 of the Eevised Statutes, was “passed in order that the Government might not be harassed by multiplying the number of persons with whom it had to deal, and might always know with whom it was dealing until the contract was completed and the settlement made.” The courts, however, have consistently held that the statute does not apply where the contractor enters into a partnership agreement with another to share the profits and the losses under the Government contract, Hobbs v. McLean, supra, and Field v. United States, 16 C. Cls. 434, or where the contractor merely subcontracts his duty to the Government. *185 Chemicals Recovery Co. v. United States, 122 C. Cls. 166. The rationale of these cases is clear. So long as the contractor remains primarily liable to the Government and retains the power to perform his duty under the contract, or to require its performance, the statute should not apply, since the Government is not being forced to deal with a stranger to accomplish its purpose.
In the instant case, however, the plaintiffs contracted away their right to perform their contract with the defendant and their power to require its performance. Under their agreement with Mr. Toledo, Toledo was given all the powers necessary for performance, and plaintiffs retained no right to control Mr. Toledo’s actions, since they gave him power of attorney to act in their place and stead. In such a situation, the Government, to obtain effective performance of the contract, would be forced to deal with Mr. Toledo since the plaintiffs had rendered themselves powerless to give any satisfaction. All dealings with regard to supervision, inspection, etc., had to be with him, and not with the contractor. We believe that it was precisely this type of transfer which is prohibited by 41 U.S.C. § 15, and we so hold.
The plaintiffs’ petition is dismissed.
It is so ordered.
Laramore, Judge/ MaddeN, Judge, and JoNes, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the briefs and argument of counsel, and the report of Trial Commissioner Wilson Cowen, makes the following findings of fact:
1. On May 11, 1955, the Department of Labor, Division of Procurement, issued an invitation for bids for furnishing all meals required for Mexican workers by the Farm Placement Service of the Department of Labor from July 1, 1955, through June 30,1956, at one or more of the following reception centers: Hidalgo, Texas; Eagle Pass, Texas; El Paso, Texas; Nogales, Arizona, and El Centro, California.
The proposed contract was to be let pursuant to the Mexican Labor Program operated by the Department of Labor, which makes arrangements for bringing Mexican farm *186 workers to this country to supplement domestic labor where shortages are known to exist. Upon entering the United States, the laborers are sent to the reception centers, located along the Mexican Border, and are customarily quartered overnight in the centers and furnished one to three meals before going to the farms where they are employed.
2. The invitation for bids was entitled “Invitation, Bid, and Award” and provided that the bids were subject to the terms and conditions of the invitation, as well as the attached schedules and general provisions. The lower portion of the first page was designated “Award” and contained a space for the signature of the contracting officer upon his acceptance of the bid. It was a complete document which embraced the invitation, the bid, the award to the successful bidder, and the terms and provisions of the contract.
3. In May 1955 plaintiff McPhail owned and operated a restaurant in Bernalillo, New Mexico. She had held various jobs in restaurants since 1939, and in 1951 began the operation of a cafe in Jackson, Mississippi. She sold the cafe and purchased the restaurant in Bernalillo in March 1953. Plaintiff Montoya, who also resided in Bernalillo at that time, had previously worked for the Department of Labor in El Paso, Texas, and had observed the operation of the feeding program at that center.
After obtaining a copy of the invitation for bids, the plaintiffs formed a partnership in 1955 under the name “Western Enterprise Co.” The partnership was organized to submit a bid for and, if the bid was accepted, to perform the contract for feeding the Mexican farm workers at the five reception centers described in the invitation.
4. The invitation required that the bids be received not later than 11 a.m. on May 27, 1955, and prior to that time, the defendant received a bid which was signed by “Mrs. Julia McPhail” in the space reserved on the first page for the signature and title of the person authorized to sign the bid. Also on the first page in the space to be filled in with the name and address of the bidder, appeared the following:
Mrs. Julia McPhail
Gen. Del.
Bernalillo, New Mexico
*187 No other person, was named in the hid as contractor, but one of the requirements for bidding as stated in the invitation was the following:
REQUIREMENTS EOR BIDDING
Bidders will submit information showing financial stability, and catering experience. Bids will be considered only from responsible organizations or individuals now or recently engaged in the operation or management of cafeterias or restaurants comparable to that as described herein which has furnished good food under sanitary conditions at reasonable prices. Each bidder shall furnish with each copy of his bid a narrative statement listing comparable establishments which he has operated or managed during the last two years and also a general history of his operating organizations and experience. Before the bid is considered for the award the bidder may be requested by the Secretary to submit a detailed statement of financial information showing the actual working capital available and this information will be considered in selecting the bids to be accepted. The right is reserved to reject any or all bids.
Plaintiffs McPhail and Montoya both signed the required narrative statement which was submitted with the bid. The statement read in part as follows:
In accordance with the requirements for bidding, I am submitting a narrative which gives an analysis of the experience which I believe qualifies me to make a bid on the contract which my business partner and I are seeking.
*****
My business partner and I have made a thorough examination of the requirements needed to feed the number of people which this contract covers, and we believe that through my restaurant experience, and his managerial experience with labor, we are capable of living up to these requirements. We have also made a personal and thorough study of the problems which we will encounter at the different reception centers, and we feel that we will be able to serve your needs adequately.
If our bid is accepted, we are ready to meet the required bond, and to forward a financial statement if this statement is required by you.
*188 5. The invitation, bid, and schedules as submitted contained the following provisions and specifications:

A

1. AwaRd. — The right is reserved, as the interest of the Government may require, to reject any or all bids and to waive any minor informality or irregularity in bids received. The Government may accept any item or group of items of any bid unless qualified by specific limitation of the bidder. UNLESS othekwise pkovided IN TI-IE SCHEDULE, BIDS MAY BE SUBMITTED FOR ANY QUANTITIES LESS THAN THOSE SPECIFIED ; AND THE GOVERNMENT RESERVES THE RIGHT TO MAKE AN AWARD ON ANY ITEM FOR A QUANTITY LESS THAN THE QUANTITY BID UPON AT THE UNIT PRICE OFFERED UNLESS THE BIDDER SPECIFIES otherwise in his bid. The contract shall be awarded to that responsible bidder whose bid, conforming to the Invitation for Bids, will be most advantageous to the Government, price and other factors considered. An award mailed (or otherwise furnished) to the successful bidder within the time for acceptance specified in the bid results in a binding contract without further action by either party.

B

.10. Bids. — (a) Data. Each bidder shall furnish the information required by the Bid form. The bidder should print or type his name on the Schedule and each Continuation Sheet thereof upon which he makes an entry.
$ ^ ‡ ‡
(o) Late. No bid or modification thereof received after the time set for opening will be considered except that when a bid or modification arrives by mail after the time set for opening, but before award is made, and it is determined by the Government that nonarrival on time was due solely to delay in the mails for which bidder was not responsible, such bid or modification thereof will be considered.
¡fi 5}i ‡ Jfc
(g) Telegraphic. Telegraphic bids will not be considered unless authorized in the Schedule, although bids may be modified by telegraphic notice provided such notice is received prior to the time set for the opening of the bids.

*189
o

Feeding Contkact
1. Mrs. Julia McPhail hereinafter referred to as the Contractor agrees to provide meals under the terms and conditions herein specified at the times and in the numbers requested by the duly authorized representative of the Secretary of Labor (hereinafter called the Manager) 'at one on moke of the Reception Centers listed below, and the Secretary of Labor (hereinafter called the Secretary) agrees to order from the Contractor all of the meals required at such Reception Centers for Mexican Workers, for the duration of this contract.
2. The Contractor agrees to provide meals at the following price per meal:

3.Meals shall be furnished in accordance with the menu attached hereto and made a part hereof. The quantity of food per meal served will be in direct proportion to the attached scale of food quantity per 100 workers.
Menus, recipes, the quality of foods and commodities, size of portions, and the method service, shall be subject to the review and approval of the Manger [sic] at all times.

D

16. This contract may not be assigned or transferred.

E

18. The Contractor shall provide for and surrender to the United States Department of Labor a bond for the faithful performance of this contract, in the sum of ten thousand dollars ($10,000) for each Reception Center which is serviced by the Contractor, except in the case of Nogales, Arizona, in the sum of five thousand dollars ($5,000), in such form as will meet with the approval of the United States Treasury Department.

*190
F

21. This contract shall become effective on July 1, 1955, shall remain in force and effect thru June 30,1956 and may be terminated by the Secretary of Labor at any time prior thereto upon thirty (30) days notice in writing to the Contractor.
6. Fifteen bids for the contract were opened on May 27, 1955, at the office of the contracting officer in the Department of Labor, Washington, D.C. George B. Hersey, the contracting officer, was absent from his office and did not return until June 6, 1955. Acting for him and present at the opening of the bids was John N. Demorest, Jr., Assistant Chief of the Division of Procurement, who was authorized to accept bids and execute contracts for the Department of Labor in the absence of the contracting officer. Also present were Miss Hazel Weeden, a procurement and supply assistant who recorded the bids, and Charles B. Paul of the Farm Placement Service, the division of the Department of Labor in direct charge of the feeding program. He had prepared the specifications attached to the invitation.
One of the bidders, the Omaha Boarding Company, had a representative present at the opening but no representative of plaintiff was there.
7. After the bids were opened, it was found that the bid signed by plaintiff McPhail was the lowest for the three hot meals — breakfast, dinner, and supper. However, the defendant’s representatives noted the absence of any quotation in the McPhail bid on the item “Box Lunch with drink”, and they considered the quotation “Fifteen per cent plus” on the item “Box Lunch without drink” to be ambiguous and not understandable. After discussion, it was decided that Mr. Paul should telephone plaintiff McPhail to obtain a clarification of the bid.
8. On May 31, 1955, Mr. Paul talked by telephone with plaintiff McPhail in Bernalillo, and when he mentioned the two box lunch items and asked for a clarification of the bid, she referred to paragraph 17 of the contract specifications attached to the bid and reading as follows:
17. When requested to do so by an employer of Mexican workers and subject to the approval of the Man *191 ager, tlie contractor shall provide and sell to such employer hot meals which shall be of the same quantity and quality as are provided for in this contract at the contract price shown herein. Bos lunches prepared by the Contractor at the center for the account of the contractor and of the same quantity and quality as are provided for in this contract may be sold to the employer at a rate not to exceed 15% higher than the contract price shown herein, rounded to the next higher cent. It is understood that the Government will bear no responsibility for any billings, payment or collection involved in this paragraph.
She explained that she understood the above-quoted provision to mean that the bidder’s quotation for the box lunches could not exceed the price quoted for the hot meals by more than 15 percent, plus the actual cost of the drink with the box lunch. Thereupon, Mr. Paul asked her to send a telegram to the Department of Labor submitting quotations on the box lunch items with and without drinks and supplying information concerning her financial resources and credit references. He also told her that she was the low bidder on the hot meals but did not advise her as to any prices that had been quoted by other bidders.
9. On the next day, June 1, 1955, the following telegram, signed by plaintiffs McPhail and Montoya, was received by the Division of Procurement, Department of Labor:
MONET AVAILABLE FOR BEGINNING OPERATION THROUGH JOHN BLACKSHERE, ALGODONES NEW MEXICO. EINANCIAL STATEMENT AVAILABLE AT ALBUQUERQUE NATIONAL BANK MAIN OFFICE, FOR ABOVE.
ASSETS FOR JULIA MCPHAIL TOTAL 14,934.00 FROM RESTAURANT EQUIPMENT, TRUCK AND CAR.
ASSETS FOR M G MONTOTA TOTAL 15,000.00 FROM REAL ESTATE. LETTERS OF CREDIT STABILITY WILL FOLLOW. BOND IS AVAILABLE. BOX LUNCH BID, IS 26 CENTS EACH ALONE. 30 CENTS WITH DRINK. REFERENCE IS FILO M SEDEELO ATTORNEY CARE OF SENATOR CHAVEZ, SENATE OFFICE BLDG WASH D.C.
John Blackshere, referred to in the telegram, was a rancher of substantial means who, prior to the date the bid was submitted, had agreed to furnish financial asistance to plaintiff McPhail for the performance of the contract if the bid was accepted.
*192 10. Upon receipt of the telegram, Mr. Demorest forwarded it and the 15 bids previously submitted to the Foreign Labor Division of the Department of Labor, which returned the bids with the following recommendation:
We have reviewed all of the bids for feeding at the Eeception Centers, and recommend that the over-all contract be awarded to Mrs. Julia McPhail solely on the basis of being the low bidder. We offer this recommendation with some reservations because her financial statement and her experience record do not seem to be adequate to take on an undertaking of the size and nature of the operation required under the contract; however, since Mrs. McPhail’s statement submitted with the bid states that she has made a check of the Centers and is thoroughly familiar with all of the requirements, we feel that there is no alternative to our recommendation of acceptance.
In view of the short time between now and July 1, we suggest that the contract award be made immediately.
On June 2, 1955, Mr. Demorest sent the following telegram of acceptance:
MRS JULIA MCPHAIL
GEN DELT,
BERNALILLO N MEX
TOUR BID E0R BURNISHING MEALS AT HIDALGO TEXAS, EAGLE PASS TEXAS, EL PASO TEXAS, NOGALES ARIZONA AND EL CENTRO OALIP RECEPTION CENTERS HAS BEEN ACCEPTED BT THE GOVERNMENT SUBJECT TO RECEIPT OP TOUR PERFORMANCE BOND IN THE AMOUNT OP ?45,000 COVERING ALL CENTERS ON OR BEFORE JUNE 10 IN THIS OFFICE.
GEORGE R HERSET
ADMIN OFCR EMPLOTMENT SECURITT OFFICE
WASHINGTON D. C.
Mr. Hersey, the contracting officer, had not returned to his office at the time the telegram was sent but, as previously stated, Mr. Demorest was authorized to act for him in the acceptance of bids.
11. Shortly after the receipt of the telegram of acceptance, plaintiff McPhail learned from Mr. Blackshere that he preferred to have her seek financial assistance elsewhere. Therefore, she and plaintiff Montoya consulted the Albuquerque National Bank on June 4, 1955, and unsuccessfully sought financial assistance from other sources. One individual *193 offered to buy the contract outright but the offer was refused.
12. The contracting officer returned to duty on Monday, June 6, 1955, and reviewed the events that had transpired in his absence. After examining the bid signed by plaintiff McPhail, the telegram of June 1, 1955, which supplemented the bid with respect to the box lunch items, and the defendant’s telegram of acceptance of June 2, 1955, he decided that the written bid was incomplete and unresponsive and doubted whether a contracting officer had authority to accept a bid which had been so modified after the time fixed for the opening of bids. He conferred with his staff and with the Assistant to the Administrative Assistant Secretary of the Department of Labor. It was agreed that a decision should be obtained from the Comptroller General as to the authority of the contracting officer to accept the bid that had been modified in the manner described above and that Mr. Hersey should immediately get in touch with Mrs. McPhail to inform her that the question was being submitted to the Comptroller General and to advise her not to incur any expense in supplying a performance bond, pending receipt of the Comptroller’s decision.
13. On June 8, 195'5, Mr. Hersey placed a long distance telephone call to plaintiff McPhail at Bernalillo, New Mexico. He was told 'by the operator that she was not at home but that her husband, Bobert G. McPhail, was available. Mr. Hersey agreed to talk with Mr. McPhail, who said that he would relay the message to his wife. The testimony is in dispute as to what was said during the telephone conversation, but the greater weight of the evidence shows that Mr. Hersey referred to plaintiffs’ telegram of June 1, 1955, supplementing the bid; stated that, in his opinion, his office lacked authority to accept the telegraphic modification of the bid after the opening, and that only the office of the Comptroller General had authority to approve such a modification; that the question was being submitted to the Comptroller General and as soon as an opinion was obtained from that official, plaintiff McPhail would be notified. Mr. McPhail made some reference to the contractor’s performance bond which, according to defendant’s telegram of June 2,1955, was to be filed on or before June 10,1955. Mr. *194 Hersey told Mr. McPhail to disregard that part of the telegram which related to the filing of the bond until advice was received from the Comptroller regarding the modification of the bid. Mr. Hersey further stated that if the Comptroller General agreed that the telegraphic modification of the bid was acceptable, it would be necessary for plaintiff McPhail to verify, over her signature, the prices quoted for the two box lunch items.
Both witnesses testified in good faith as to their recollection of the conversation, and it is apparent that Mr. McPhail did not fully comprehend the purpose of the submission of the question to the Comptroller General nor the effect of that action on the bid.
14. Following his telephone conversation with Mr. Mc-Phail, Mr. Hersey and Ms assistant prepared a draft of a letter to the Comptroller General. The draft recited the facts with respect to the bid, the telegraphic modification thereof after the opening, the telegram of acceptance, and requested a decision as to the propriety of the action taken. The draft was delivered to the office of the Administrative Assistant Secretary of the Department who, on June 9,1955, wrote the Comptroller General requesting an opinion as to whether the supplementation of the bid could be permitted after the opening of the bids and the contract awarded accordingly. The letter set forth the pertinent facts as contained in the draft prepared by Mr. Hersey, except that the letter to the Comptroller failed to state that a telegram of acceptance had already been sent to plaintiff McPhail.
15. On June 10, 1955, the contracting officer received the following telegram signed by Julia A. McPhail:
THE POSTING OF BOND IS BEING POSTPONED AT TOUR SUGGESTION VIA TELEPHONE CONVERSATION PENDING ON MX RECEIVING THE PAPERS TOUT NEED MX SIGNATURE FOR ON THE BOX LUNCHES.
16. Sometime after the telegram of acceptance was received, plaintiffs had made application for a performance bond to the firm of Seligman and Sackett of Albuquerque, New Mexico, who were agents for the Eoyal Indemnity Company. On June 10, 1955, Seligman and Sackett wrote the contracting officer as follows:
*195 Re: Julia A. McPhail AND MakiaNO G. Montoya, Jr. Dome BusiNess as Western Enterprise Company
Dear Sir:
At tbe request of tbe above named individuals we enclose herewith. Performance Bond in the amount of $45,000.00, in quaduplicate [sic], for furnishing meals at Hidalgo, Texas, Eagle Pass, Texas, El. Paso, Texas, Nogales, Arizona, and El Centro, Calif. Reception Centers.
We have used U.S. Gov’t Standard Form 25 for this purpose and if there is anything that needs amendment or correcting, please let us know and we will take care of the matter. For example, we do not have the Contract number.
We telegraphed you today as per copy of telegram attached herewith.
If we can be of any further service in this matter, please let us hear from you.
17. On June 11, 1955, the Department of Labor received the following telegram signed by Seligman and Sackett addressed to the contracting officer:
AS AGENTS POR ROYAL INDEMNITY CO WE HAVE TODAY EXECUTED AND AIRMAILED YOU PERFORMANCE BOND IN THE AMOUNT OF 45,000 IN BEHALF OF JULIA A MCPHAIL AND MARIANO G MONTOYA JR DOING BUSINESS AS WESTERN ENTERPRISE CO IN YOUR FAVOR PER YOUR TELEGRAM DATED JUNE 2ND 1955 AND COVERING ALL CENTERS REFERRED TO THEREIN.
18. In view of his telephone conversation with Mr. Mc-Phail and the telegram sent by plaintiff McPhail on June 10, 1955, Mr. Hersey was puzzled by the communications from Seligman and Sackett. However, he did not attempt to get in touch with plaintiff McPhail nor did he write her confirming the telephone conversation he had had on June 8,1955, with her husband.
19. On June 9 or 10, 1955, plaintiffs met with Manuel B. Toledo of Albuquerque, New Mexico, who, during the period from 1944 to 1951, had operated camps for feeding Mexican laborers under contracts with farmers in Utah, Idaho, and Oregon. Mr. Toledo promised to assist in financing plaintiffs to the extent of accommodating them with his signature *196 on a note of $12,000 to the First National Bank of Albuquerque. Mi'. Toledo had the reputation of being a man of substantial means. In the discussion plaintiffs had with him, it was agreed that in view of his experience, he would manage the feeding operations under the contract with the Department of Labor and would be in charge of all personnel. Plaintiff McPhail was to be stationed at El Paso, which was regarded as the central artery of the five centers, and was to receive daily reports showing the number of meals served, the cost of labor, and the amount of food used at each center. Plaintiff Montoya was to be located in the center at El Centro, California, but the record does not show what duties he was to perform. In consideration of Mr. Toledo’s services and financial assistance, it was agreed that he would be paid 50 percent of the net profits resulting from the contract with the Department of Labor. Payments received from the Government were to be deposited in the First National Bank of Albuquerque under the name of Western Enterprise Co., and the bank was to be given a power of attorney to endorse and deposit such checks in that account. The parties met again on June 11, 1955, in Albuquerque in the office of Mr. Toledo’s attorney who prepared a contract, designated as a “Management Agreement”, between plaintiffs as first parties and Mr. Toledo as second party. The agreement was duly signed and acknowledged by plaintiffs and Mr. Toledo on June 11, 1955. It is in evidence as plaintiffs’ exhibit “O” and provides in pertinent part as follows:
WheReas Parties of the First Part are the contractees with the government of the United States under which contract they are to provide food for certain persons. (A copy of which contract is attached and marked Attachment One, not as part'of this contract, but for identification only) and
WheReas Parties of the First Part are desirous of retaining the services of the Party of the Second Part as manager of their operations under said government contract,
Now, THEREFORE, in consideration of the mutual promises and covenants herein contained the parties agree as follows:
*197 Parties of the First Part hereby employ the Party of the Second Part to operate and manage all feeding centers, together with any and all stores, concessions, PX’s, and commisaries [sic] of whatever nature with the following powers, and under the following terms and conditions.
Party of the Second Part to take charge of the business of the Parties of the First Part resulting from the contract with the United States Government; to employ and discharge all personnel deemed necessary by the Party of the Second Part for the operation of the business; to purchase, and sell, either for cash or on credit, all such articles and property as the Party of the Second Part may deem useful and proper as connected with said business; sign, accept, and endorse notes, drafts, and bills; to state accounts; to sue and proseucte, [sic] collect, compromise, or settle all claims or demands which may hereafter become due, or hereafter arise in favor of the Parties of the First Part; to adjust, settle, and pay all claims and demands which may arise out of the operation of the business, and therein to buy, sell, pledge, or mortgage, and to execute and enter into bonds, contracts, mortgages and in general do all other acts and things which the Party of the Second Part may consider useful or necessary for the aforementioned business and interest; and to enable the Party of the Second Part to effect the powers heretofore mentioned the Parties of the First Part both residents of the County of Sandoval and State of New Mexico hereby make, constitute and appoint Party of the Second Part, Manuel B. Toledo, of the County of Bernalillo and State of New Mexico, jointly and severally, their true and lawful attorney for each and both parties of the First Part and in their name, place and stead, to execute in and under their name any and all instruments of whatever nature, as the Party of the Second Part may deem useful or necessary for the business.
The Party of the Second Part shall under and pursuant to the powers herein given him, keep a set of books which shall be available for inspection and auditing by the Parties of the First Part at all times; pursuant to said powers, he shall have the duty to secure and record all necessary licenses and permite that may be required for the operation of the business and shall at all times as part of the operation of said business, keep in force such Workmen’s Compensation, employer’s liability, and public liability insurance as the *198 Party of the Second Part may deem necessary for the protection of the business, but under no circumstances may such insurance be less than that required by the state in which the business is being conducted.
❖ :[« * ❖ ❖
Any and all monies whether received by the Parties of the First Part or the Party of the Second Part shall immediately be deposited into the bank account designated by the Party of the Second Part and the Party of the Second Part shall have the sole and exclusive power to draw upon said account, but no monies may be drawn from said account for other than the operation of the business except as hereinafter specified.
The parties of the First Part will not demand of and the Party of the Second Part will not during the first sixty (60) days commencing July 1, 1955, give to the Parties of the First Part any funds for personal use. After the expiration of the first sixty (60) days neither parties of the First Part nor the Party of the Second Part shall obtain any funds from the business unless it has first been determined by the Party of the Second Part that there are sufficient funds on reserve for the continued safe and economical operation of the business.
At such time as the Party of the Second Part determines that the continued safe and economical operation of the business will not be endangered thereby, but in no event later than 120 days from the — day of June, 1955, the Party of the Second Part shall withdraw such sums as may be needed to pay that certain note executed by the Parties of the First Part and co-signed by the Party of the Second Part, made payable to the First National Bank of Albuquerque together with interest thereon.
íJí jJ: íj: % %
The party of the Second Part accepts the powers, duties, and obligations given him by the Parties of the First Part and agrees to operate and manage the said business of the Parties of the First Part to the best of his ability and judgment; further the Party of the Second Part agrees to help to finance the operations encompassed by this agreement for the first sixty (60) days commencing the 1st day of July 1955, by accommodating the parties of the First Part with his signature on a promissory note to be executed by the Parties of the First Part for the total amount of Twelve Thou *199 sand ($12,000) Dollars to the First National Bank oí Albuquerque. It is agreed and understood by the Parties that the extent of financial aid to be rendered by the Party of the Second Part shall be limited to the extent immediately hereinbefore stated unless by subsequent written agreement the parties agree otherwise.
As compensation for services rendered by the Party of the Second Part pursuant to the terms hereof, the Parties of the First Part agree to pay the Party of the Second Part a sum equal to fifty (50%) per cent of the net operating profit of said business; said compensation to be paid to the Party of the Second Part proportionately at such times as the Parties of the First Part draw funds subject to the limitations hereof that a reserve for future operations be maintained. It is understood that any drawings made by the Parties shall not' be considered as operating expenses.
No representative of the defendant had notice or knowledge of the above-described agreement.
20. With a view to moving to El Paso on July 1, 1955, when performance of the feeding contract was to start, plaintiff McPhail decided to dispose of her restaurant in Berna-lillo and she closed it on June 12,1955. She and her husband were living in a rented home in Bernalillo, and shortly before June 15, 1955, she gave notice to the landlord that she would vacate the house on July 1, 1955.
On June 14, 1955, plaintiffs went to Albuquerque where they and their respective spouses signed a note for $12,000 payable to the First National Bank of Albuquerque. Manuel B. Toledo also signed the note.
21. On June 15, 1955, plaintiff McPhail and her husband went to El Paso and were joined there the next day by Mr. Toledo and plaintiff Montoya. Under the terms of the contract with the Department of Labor, the contractor was obligated to furnish all kitchen and mess hall equipment and utensils, as well as the food to be served to the laborers. The group’s purpose in going to El Paso was to make arrangements for obtaining the equipment and to talk with various wholesalers from whom food for the five centers was to be purchased. On June 16, plaintiffs and Mr. Toledo went to the El Paso [Reception Center where they were in *200 troduced to Department of Labor personnel and to a Mr. Fuller, wbo held the feeding contract for the five centers for the fiscal year ending June 30, 1955. They inspected the feeding facilities at the center and observed the feeding operation.
22. On June 17 and 18, 1955, plaintiffs and Mr. Toledo negotiated with Mr. Fuller to purchase the latter’s equipment. Since the equipment was already installed and since performance of the contract was to begin on July 1, 1955, they considered it advantageous to acquire Mr. Fuller’s equipment. It was decided that on June 20, 1955, plaintiff Montoya and Mr. Toledo would visit 'all the centers for the purpose of inventorying the equipment and making arrangements to acquire it.
23. On June 19, 1955, plaintiffs met with Mr. Toledo and his attorney in Santa Fe, New Mexico. Mr. Toledo stated that in view of the cost of the equipment, considerably more capital would be required for the venture than he had at first believed, and he requested that plaintiffs agree to pay him 75 percent instead of 50 percent of the profits for his services and financial backing. Although plaintiffs refused to accede to this request, he did not withdraw from the agreement previously executed. Mr. Toledo planned to return to his home in Albuquerque in order that he could convert some of his bonds and securities into cash in order to provide funds needed for the operation.
24. On June 19, 1955, plaintiffs returned to Bernalillo, and on the morning of June 20,1955, plaintiff Montoya and B.. G. McPhail left Bernalillo to meet Mr. Fuller in El Paso as previously arranged.
25. By letter dated June 17, 1955, the Comptroller General advised the Secretary of Labor that the written bid signed 'by plaintiff McPhail was not complete, responsive, definite, or certain, and that to permit her to complete and explain the bid after the opening, would give an unfair advantage. The letter stated that the bid should be disregarded.
26. On June 20, 1955, after receiving the Comptroller General’s letter of June 17,1955, the contracting officer tele *201 phoned Mrs. McPhail in Bernalillo. He informed her that the Comptroller General had ruled that the bid was unresponsive, that it could not be accepted by the Government, and that the defendant’s telegram of acceptance would not stand.
She inquired whether the matter could be reconsidered and was told that such action was not possible.
In confirmation of the telephone conversation, the contracting officer wrote plaintiff McPhail on June 22, 1955, stating that 'her bid had been disregarded because of a failure to quote prices on the two box lunch items. The letter also stated that the performance bond submitted by plaintiffs was being returned.
27. When the telephone conversation of June 20, 1955, occurred, plaintiff Montoya and E. G. McPhail were en-route to El Paso. At plaintiff McPhail’s request, the highway patrol stopped them and advised them to return to Bernalillo. Also, in the morning preceding the telephone conversation, plaintiff McPhail met with a prospective buyer of her restaurant in Bernalillo but had not completed the sale of the restaurant by the time she talked with the contracting officer.
28. The award portion of the bid submitted by plaintiff McPhail was never completed nor signed by the contracting officer. After receipt of the Comptroller General’s decision, Mr. Hersey awarded feeding contracts to the next lowest bidders, Pat Stevens for the El Paso Center, and the Omaha Boarding Company of Chicago for the remaining reception centers.
29. The trial was limited to the issues of law and fact relating to the right of plaintiffs to recover.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are not entitled to recover and their petition is therefore dismissed.

 Section 15 of Title 41, XJ.S.C. provides, in pertinent part, as follows:
“No contract or order, or any interest therein, shall be transferred by the party to whom such contract or order is given to any other party, and any such transfer shall cause the annulment of the contract or order transferred, so far as the United States are concerned.”

 In submitting the facts to the Comptroller General, the Department of Labor failed to state that it had accepted the plaintiffs’ bid, as explained and completed.