Scoeield, J.,
delivered the opinion of the court.
This suit grows out of four different contracts between the United States and Paulding, Kemble & Co.
By the first contract, dated October 22, 1880, the claimants agree “to furnish four coiled wrought-iron tubes, with miizzie-eollars of 12-inch caliber, for use in the fabrication of the same *18 number of 12-inch breech-loading' rifles,” to be delivered on or before Jane 30, 1881. The defendants were to pay $7,700 for each tube.
By the second contract, dated December 1, 1880, the claimants agree “ to do the work of converting five 10-inch smooth-bore Rodman guns into 8-iuck breech-loading rifles, by inserting from the rear coiled wrought-iron tubes,” to be delivered December 1,1881. For each gum so converted the defendants were to pay $3,780.
By the third contract, dated December 1,1880, the claimants agree “to do the work of converting two 15-inch smooth-bore Rodman guns into 11-inch breech-loading chambered rifles, by inserting from the rear wrought-iron coiled tubes,” to be delivered December 1, 1881. For each gun so converted the defendants were to pay $9,000.
By the fourth contract, dated December 27, 1880, the claimants agree “to do the work of converting one 15-inch smooth-bore Rodman gun into an experimental 12-inch breech-loading chambered rifled mortar-howitzer, by inserting from the rear a wrought-iron coiled tube,” to be delivered within fourteen months from date. The defendants were to pay therefor $8,258.
In all of these contracts the defendants agree to deliver the smooth bore guns to the claimants, and accept the return of them, after conversion, at the claimants’ works.
November 7,1881, after considerable progress in the performance of the contracts had been made by the claimants, the entire work was ordered to be suspended by the defendants, except on two specimen guns — one of the 8-inch and one of the 11-inch caliber. Shortly before the suspension two guns, similarly converted for the Government by another firm, had failed in firing.
The suspension was not based upon any alleged default, on thiTpart of the contractors, but was otherwise made “ in the interest oFThé United Stales.” Counsel for tne defendants claim that it is a fair inference from the facts that the defendants were apprehensive that this change of Rodman guns into rifles would prove a failure, and they wished to test it with two experimental guns, one of each caliber, before proceeding further. While this inference approves the motives of the de *19 fend ants’ object in making the suspension, it also tends to relieve the claimants from suspicion of fault.
December 13, 1881, about five weeks after notice of suspension, and in consequence of it, the parties entered into a new arrangement, which they called “ supplemental articles of agreement, amendatory of the contracts.”
In this amendatory contract the defendants agree to pay the ■claimants for the work already done $42,029, and to allow them to complete the work if they (the defendants) should eventually desire to have it done by anybody. The claimants agree to accept this sum in full satisfaction of all work and profits up to that date, and to complete their several contracts “when so permitted ” by the defendants on the original terms.
In determining the effect of this “amendatory contract” ■upon the pending claim we must consider the status of the parties immediately before its execution.
The defendants had suspended part of the work yet to be done~uncier the~cbntracts, but had not undertaken to abrogate the contracts themselves. The suspension was not entire and it might not be permanent. The word suspension carries with it an intimation of resumption. In consequence of it, how•ever, the claimants were at liberty" to abandon the contracts altogether, and demand pay not only for all work then done, including reasonable profits, but additional profits, if any coukT be made to appear on the un-execnted portion of the contracts. They did not, however, insist upon all their rights at that time. By entering into the new contract they suspended or waived, at least for the time being, their present right to claim future profits. They even consented to the continuance of the suspension until the defendants could determine whether they wanted the work to go on or not.
Did they also agree to relinquish their claim for future profits in case the defendants should filially decide to abandon the work ¶ They certainly did not in terms, nor< an such relinquishment be fairly inferred from anything in the contract itself. All the inferences seem to point in the opposite direction. The four original contracts were kept alive by stipulation. The claimants agreed to go on with them as soon as “permitted.” They were required to and did give new bonds for future performance. They were thus required to hold themselves in readiness to resume work when so ordered. It is recited in *20 the amendatory contract that the amounts paid are “partial payments” on the original contracts “to the extent of the values of the work thus far finished and delivered.” The defendants on several occasions extended the time for completing these contracts, awaiting their final decision.
From these facts and circumstances the court comes to the conclusion that the claimants did not, by the amendatory contract, relinquish Their right* to claim their profits on the unex-ecuted portion oOhe fou'Fcontracts whenever the defendants-should aecide to abandon them.
Rut it is said the defendants have never so decided. That is true, but they have done what is equivalent to such a decision.. Although repeatedly urged by the claimants to decide the question, they kept them waiting for the. decision until after the appropriation for the work had been withdrawn from the-control of the Department and covered into the Treasury.. They waited five years before bringing suit.
By this long<delay_$he defendants, in effect, abandoned the contracts, and thereby revived tfie claimaúts’right to'sueTor damages.
In the case of Speed v. The United States (8 Wall., 77) the Supreme Court lays down the rule for measuring damages in such cases as follows: “ The difference between the cost of doing the work and what the claimant was to receive for it, making, reasonable deduction for the less time engaged and for the release from the care, trouble, risk, and responsibility attending, a full execution of the contract,” is the measure of damages.
Following this rule, the court has calculated the claimants” damages at $4,998.80.
The defendants’ counter claim consists of the following items:
Contract October 22, 18SO, four 12-incb wrought-iron tubes . $7,000
Contract December 1, 1880, five 8-inch conversions. 5,000
Contract December 1, 1880, steel parts, two 11-inch guns. 2,500
Contract December 1, 1880, two 11-inch conversions. 4,000
18,500
These items are the forfeitures or liquidated damage provided for in the several contracts for non-pérformance thereof.
As to the three items first named, it is enough to say that the time specified in the original contracts for completing the work had not expired when it was suspended by order of the defendants.
*21 As to the fourth item, the original time fixed for completion of the work had been extended by agreement of parties to a time subsequent to the date of the suspension.
At the time of suspension, therefore, the defendants were not entitled to claim these penalties, and certainly they could not afterwards hold the claimants to perform the work which they (the defendants) had forbidden them to do.
Judgment will be entered for the claimants in the sum of $4,998.80, and the counter claim will be dismissed.