## IDAHO FALLS BONDED PRODUCE & SUPPLY CO. v. UNITED STATES.
### No. 48872.

United States Court of Claims.
Nov. 4, 1952.

C. Robert Mathis, Washington, D. C., for plaintiff. Seth W. Richardson, Washington, D. C., George L. Barnard, Idaho Falls, Idaho, Davies, Richberg, Tydings, Beebe & Landa, Washington, D. C., and Albaugh, Bloem, Barnard & Smith, Idaho Falls, Idaho, on the briefs.

William A. Stern II, Washington, D. C., Holmes Baldridge, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

MADDEN, Judge.

The plaintiff sues the Government for damages for breach of contract in refusing to accept and pay for 74,798 one-hundred-pound bags of potatoes.

The plaintiff is a wholesale potato marketing corporation in Idaho. On August 13, 1945, it entered into a contract with S & W Fine Foods, Incorporated, to sell to S & W 150,000 one-hundred-pound sacks of Idaho potatoes which the plaintiff was to obtain from growers and loaders in Idaho and earmark as potatoes acquired to fulfill the S & W contract. S & W had theretofore made a contract with the Government to furnish dehydrated potatoes to the Government, and S & W's contract with the plaintiff was made to assure it of a supply of raw potatoes for dehydration. The Government terminated its contract with S & W on August 29, 1945. S & W thereupon notified the plaintiff that it would refuse to accept any further deliveries of potatoes, and that the Government would assume responsibility for S & W's repudiation of its contract. The Government was obliged, under the Contract Settlement Act, to indemnify S & W against liability to its suppliers such as the plaintiff.

At the time that S & W repudiated its contract with the plaintiff, the plaintiff had contracted with growers to purchase 139,000 sacks of potatoes for use on the S & W contract. The plaintiff did not attempt to repudiate its contracts with the growers. The Chicago Quartermaster Depot of the United States Army, which had contracted with S & W for the dehydrated potatoes, in late October 1945 sent Lieutenants Kelley and Earle to Idaho to adjust claims arising out of various contracts for the dehydration of potatoes. They told the plaintiff's manager that they would like to make an arrangement for the Army to take over the potatoes for which the plaintiff had contracted with growers in connection with its contract with S & W. The plaintiff's manager expressed interest. The Lieutenants asked him to furnish a list of suppliers with whom the plaintiff had contracts. He refused to do so. They told him the Army did not really want potatoes and was making its proposal only because

the Government was obligated to purchase the potatoes contracted for by S & W; that under no circumstances would they buy any potatoes that were not contracted for to carry out the S & W contract. The plaintiff's manager said that it was none of the Army's business who the plaintiff's suppliers were.

By this time the price of potatoes had fallen substantially. The Quartermaster Corps was receiving complaints from Idaho growers who had not sold their potatoes at the earlier higher prices, that the Government was buying potatoes from dealers at high prices, supposing, erroneously, that the dealers had obligated themselves to pay high prices to the growers. The two Lieutenants investigated these complaints at various places in Idaho. When they returned to Idaho Falls in November the plaintiff's manager invited them to see him, told them that he had reconsidered his position with regard to the list of growers and gave them a list showing the names of the growers with whom the plaintiff had contracted for potatoes to supply the S & W contract, the dates of the purchase contracts, the prices, the approximate quantities, and the location of the potatoes. He also gave them an affidavit affirming the accuracy of the list. The Lieutenants told the plaintiff's manager that the Government would buy potatoes from the plaintiff only on the basis that the identical potatoes that were on the list were to be delivered. The plaintiff's manager objected, but when the reason for the Government's insistence was explained to him, and he was told that the Government would not buy potatoes on any other terms, he agreed.

A written contract was then made, dated November 15, 1945, whereby the Government agreed to buy 135,000 one-hundred-pound bags of potatoes of certain standards and sizes, which contract contained the following provision:

"* * * The Contractor warrants that the quantity of raw Irish potatoes to be delivered hereunder represents only those potatoes which the Contractor has heretofore purchased or agreed to purchase for use in the performance

of said contract for dehydrated potatoes, and that the quantity to be delivered hereunder represents all such potatoes which cannot be utilized by the Contractor or his suppliers at no cost to the Government; it being the intent of the parties hereto that the Contractor will deliver hereunder no potatoes other than those intended for use in the performance of the above specified contract for dehydrated potatoes. * * *"

When the plaintiff's manager read this provision he objected, saying that it might in some instances be a hardship to have to deliver particular potatoes. He was told that the provision would have to remain in the contract, and that if deliveries were made from growers not listed, the contract would be immediately cancelled. He then signed the contract.

The contract called for the delivery by the plaintiff of 27,000 bags of potatoes during each of the months of November and December 1945 and January and February 1946. By January 25 the plaintiff had delivered 60,202 bags. On that date the Government cancelled the contract because it had learned, on January 24, that the plaintiff had, during January, delivered four carloads of potatoes which were not potatoes bought to fulfill the S & W contract. The plaintiff protested the cancellation, expressed regret for the violation which it said was unintentional and was the result of a shortage of railway cars which had caused it to get behind in its deliveries, and offered to continue deliveries under the contract. The contract provided for the determination of disputes concerning questions of fact by the contracting officer, subject to the right of the contractor to appeal to the Secretary of War whose decision, or that of his authorized agent, should be final. The contracting officer decided against the plaintiff. The plaintiff appealed to the War Department Board of Contract Appeals, which was the Secretary's authorized agent for that purpose. The Government made a motion to dismiss the appeal on the ground that there was no dispute as to any question of fact. The plaintiff withdrew its appeal.

■■ The plaintiff urges that its contract with the Government did not require it to deliver to the Government only potatoes which it had contracted for to fulfill its contract with S & W. It says that the evidence of conversations between its manager and the two Lieutenants showing an intent different from that expressed in the contract should not have been admitted in evidence, because of the parol evidence rule. However, the pertinent provision of the contract, which we have quoted above, is ambiguous, to say the least, and it was necessary for us to learn what could be learned as to what the parties intended by it. We are convinced from the text of the contract and the discussion and circumstances connected with its making that the parties intended that, in general, only the potatoes bought by the plaintiff to fulfill the S & W contract could be delivered under the Government contract.

■ Was, then, the Government legally justified in cancelling the contract because of the January delivery of four carloads of potatoes whose delivery was not permissible under the contract? We think not. The situation apparently was that the plaintiff had on hand potatoes properly deliverable under the contract, that it was behind in its deliveries because of a shortage of railroad cars, which shortage was a valid excuse for its delay, and that it therefore still had some months within which to deliver the potatoes called for by the contract. The Government had the right to reject the four carloads. But they were merely a defective tender of performance which could be cured by a later proper tender within the agreed period of performance. Restatement, Contracts, Sec. 323 (2); Williston on Contracts, Sec. 1295; Williston on Sales, Sec. 459.

■ We have found that the Government's agent told the plaintiff at the time of the making of the contract that if potatoes not subject to the contract were delivered under it, the contract would be immediately cancelled. A unilateral oral statement such as that, purporting to drastically alter the terms and the normal legal effect of a written contract, must of course be disregarded.

■ The Government says that the plaintiff may not recover for the Government's refusal to accept and pay for the balance of the potatoes called for by the contract because the plaintiff could not have delivered potatoes of the kind permitted by the contract to be delivered. When S & W repudiated its contract with the plaintiff on August 29, 1945, the plaintiff had no further reason to segregate the potatoes which it received from growers with whom it had contracted for a supply to fulfill its S & W contract. Its contract with S & W required that it "earmark" the potatoes destined for them. It is immaterial what was meant by that requirement. From the time of the cancellation, the plaintiff's situation was that it was obligated to growers to buy 139,000 bags of potatoes, and its expected market for that quantity of potatoes had disappeared. It had no reason to suppose that, two months later, it would be told by the Government that the Quartermaster Corps public relations situation required that it buy only the identical potatoes which had been purchased from growers for the S & W contract. During those months, then, the plaintiff received potatoes from growers and handled them in its normal way, commingling potatoes with others of the same grade and size, regardless of whether they were from S & W growers or not.

Then in November came the Army's agents with their public relations problem. They requested and received from the plaintiff the list described above, showing the quantities of potatoes, the growers from whom they were bought, and the then location of the potatoes. The list was, so far as appears, completely accurate. It no doubt showed specified numbers of pounds of potatoes in storage places where, because of commingling with other non-S & W potatoes, there were many more potatoes than those specified in the list. The Army Lieutenants' normal intelligence would have told them that this was, or might be, so. It will be remembered that the Government had at that time assumed S & W's liability to the plaintiff for the breach of its contract, and that the Army was in no position to dictate impossible terms of settlement to the plaintiff. It could not have said that because the plaintiff, in the normal course of handling potatoes, had commingled the S & W potatoes with others, it washed its hands of the affair. It still had to settle its liability in some way. The fact of the commingling really had nothing to do with the public relations problem. No grower could have complained of the Army's buying 1,000 sacks of potatoes out of a warehouse containing two thousand sacks, if in fact 1,000 sacks of S & W potatoes had been put into that warehouse, though they had been so commingled that it was not possible to identify the particular potatoes. No one could have thought, in that case, that the dealer was selling potatoes at a high price which he had bought after the S & W contract was terminated and the price of potatoes had fallen.

A reasonable construction of the contract, then, in the light of the circumstances in which it was made, is that the kind of commingling which had taken place was contemplated by the contract, because otherwise the contract would have been impossible of performance at the time it was entered into.

The Army never made any objection to the commingling described above. That was not the reason given for the cancellation, either at the time of the cancellation or at any later time. Government counsel says that he discovered the commingling during the trial of the instant suit. We think he is not entitled to credit for a discovery, since what he discovered could have been, and we think must have been, assumed to be true throughout the course of the transaction. We conclude, therefore, that the Government's argument that the plaintiff may not recover because it was impossible for it to perform the contract is not valid.

■ The Government urges that the plaintiff must fail because it did not exhaust its administrative remedies. We have said that the plaintiff appealed from the adverse decision of the contracting officer; that the Government moved to dismiss the appeal on the ground that there was no dispute as to questions of fact; and that the plaintiff thereupon withdrew its appeal. We think

that the Government's position before the Board of Contract Appeals was well taken. See Martin Wunderlich v. United States, 117 Ct.Cl. 92, 212 ff., reversed on other grounds, 342 U.S. 98, 72 S.Ct. 154; McWilliams Dredging Co. v. United States, 118 Ct.Cl. 1, 16, 17. But we do not examine the point exhaustively since we think that the Government may not rely upon a failure to pursue administrative remedies when it, itself, has taken the position that there was no administrative remedy available and its adversary has acceded to that contention.

The plaintiff is entitled to recover $36,025.08.

It is so ordered.

JONES, Chief Judge, and HOWELL, WHITAKER, and LITTLETON, Judges, concur.