**CARRIER CORPORATION, Successor on Merger to Affiliated Gas Equipment, Inc.,**

v.

**The UNITED STATES.**

**No. 346-59.**

United States Court of Claims.

Feb. 14, 1964.

Rehearing Denied June 12, 1964.

Whitaker and Davis, JJ., dissented in part.

David W. Richmond, Washington, D. C., for plaintiff. Frederick O. Graves, Clarence T. Kipps, Jr., and Miller & Chevalier, Washington, D. C., were on the brief.

Richard R. Molleur and John W. Douglas, Washington, D. C., for defendant. M. Morton Weinstein, Washington, D. C., was on the brief.

Before JONES, C. J., and WHITAKER, LARAMORE, DURFEE and DAVIS, JJ.

JONES, Chief Judge.

The plaintiff seeks to recover the sum of $892,937.97 as damages caused by an alleged breach by the United States of a contract for the manufacture of high-explosive 90 mm. T-91 shells for the Ordnance Corps of the Department of the Army. The contract was cancelled after approximately 28 percent of the shells called for by the contract had been manufactured.

There are a number of issues and collateral issues involved. The defendant filed a special plea of fraud under 28 U.

S.C. § 2514. It further asserts a failure on the part of the plaintiff to exhaust the available administrative remedies under the disputes clause of the contract. The plaintiff alleges that the cancellation is a breach of contract or, in the alternative, should be treated as a termination for the convenience of the Government. The defendant denies that such a settlement should be made. The numerous other issues will be discussed in the course of the opinion.

### THE FACTS

The facts are complicated and are set out in detail in the findings. We will undertake to give a resumé of these facts.

The plaintiff is the surviving corporation in a statutory merger by which Affiliated Gas Equipment, Inc., was merged into the plaintiff on February 28, 1955. The company will be referred to as "Affiliated" hereinafter.

The United States in a supplemental agreement accepted the plaintiff as successor to Affiliated and agreed that the matters might be treated as if the contract had been made by the plaintiff.

In July 1951, Affiliated entered into a contract (referred to as "contract 506") for the manufacture of the projectile parts of the high-explosive shells referred to above. It was a negotiated contract. Deliveries were to commence upon the completion of an earlier contract (referred to as "contract 131"). Deliveries under contract 506 were to be completed within a reasonable time, "the exact rate of delivery to be negotiated by the parties."

Pertinent provisions of the contract covered inspection, default, disputes, liquidated damages, and termination for the convenience of the Government. Article No. 5, covering inspection, stipulated that all supplies, including the end-product, "shall be subject to inspection and test by the Government, to the extent practicable at all times and places including the period of manufacture, and in any event

prior to final acceptance." The article further provided that the defendant should have the right to reject any supplies that were defective in material or workmanship, or to require the correction of any defects. The contract contained the usual default, disputes, termination for convenience and liquidated damages clauses.

The original contract called for the production of 139,105 shells at a cost of $969,561.85. Supplemental agreement dated June 26, 1952, increased the number to 604,105 shells; supplemental agreement dated March 31, 1953, increased the contract to 800,105 shells; and another supplemental agreement dated May 28, 1953, increased the contract to 1,117,105 shells, the total contract price being increased each time; the final contract price being $8,169,718.-85. There were two other supplemental agreements in August 1953, one of which adjusted certain prices downward and the other certain prices upward, so that the total contract price was again slightly increased.

By supplemental agreement dated September 11, 1953, the actual delivery of shells by Affiliated during the period from June 1953 to August 1953 was established as the delivery schedule for that period.[1] Subsequent delivery schedules were established at 80,000 shells per month from September 1953 through July 1954, and a slight reduction for the final month of August 1954.

On October 30, 1953, the Army Ordnance delivered to Affiliated a written stop order. The reason for the issuance of the stop order was the discovery by Army Ordnance that Affiliated had devised and perpetrated a scheme whereby shells which failed to meet the specifications of the contract were delivered without first having been submitted to and passed by the appropriate Army Ordnance inspectors.

An elaborate system of inspection had been provided. Army Ordnance inspec-

---

1. Delivery of shells under contract 506 began in June 1953, after the delivery of shells under contract 131 had been completed.

tors were placed at three different points on Affiliated's production line. The stations were officially designated as Classification of Defects Stations Nos. 1, 2, and 3, but were commonly known as "CD–1," "CD–2," and "CD–3." At each station, shells were inspected in lots on a sampling basis for certain defects. These defects were listed, in a descending scale of seriousness, as critical, major, or minor.

The first inspection by the Army Ordnance was performed at CD–1, where the body of the shell, prior to painting, was inspected. The shells must pass this inspection before the lot could proceed further along the production line.

If a lot of shells passed inspection at CD–1, they were subjected by Affiliated's production personnel to the remainder of the prescribed manufacturing operations (except painting) before the lot was inspected by the Army Ordnance inspectors at CD–2. It may be noted here that Affiliated maintained a number of inspectors along the line in an effort to make sure that the provisions of the contract had been complied with. The Army Ordnance inspection at CD–2 related to the metal parts assembly of the shell, prior to painting. Shells at this station were inspected for impermissible variations in wall thickness, as well as for other defects. The shells had to pass this station before proceeding further along the production line.

After shells passed CD–2, the shells were painted by Affiliated's production personnel, and the finished shells were given a final inspection by Army Ordnance inspectors at CD–3.

Affiliated, through its own inspectors, conducted in-process inspection at each of the many machining operations on the shell; and Affiliated's inspectors conducted a final inspection after all the machining operations had been performed on the shell and immediately preceding the Army Ordnance inspection at CD–2. Affiliated maintained from 20 to 25 inspectors on each shift, with an inspector at each of the machining operations.

Under the inspection procedure that was established and maintained by Affiliated, shells that failed to pass the final inspection by Affiliated inspectors were taken off the production line by such inspectors and were not submitted to the Army Ordnance at CD–2. Affiliated's inspectors marked the defective shells in such a way as to indicate the nature of the defects. The shells were then taken to the Salvage Department of Affiliated's London Road plant, where they were segregated and placed in separate bins on the basis of: (1) whether the defects could be corrected by further machining so that the shells would then meet the specifications of the contract; or (2) whether, although the defects could not be corrected by further machining, the departures from the specifications were nevertheless of such a marginal nature that Army Ordnance might reasonably be expected, on the basis of a request for a deviation submitted by Affiliated, to accept the shells which were known as "deviation shells"; or (3) whether the defects could not be corrected by further machining and were of such a serious nature that there was no reasonable expectation that the shells might be accepted by Army Ordnance upon the basis of a request for deviation. Such shells were known as "scrap."

Affiliated's procedure was that (1) salvage shells would be machined further so that the shells would then meet the specifications of the contract and would then be submitted at CD–2; (2) that when a group of deviation shells had been assembled, it would be made the subject of a request to Army Ordnance for a deviation, and the shells would be held in the Salvage Department pending action on this request; and (3) that the other defective shells would be disposed of as scrap.

The Army Ordnance established the following procedure for examination and consideration of requests by Affiliated for deviations: (1) Affiliated was required to fill out a prescribed form with respect to a batch of shells on which it wished to request a deviation, that is, ac-

ceptance of the shells despite slight departures from the requirements of specifications. (2) The form was submitted by Affiliated to Army Ordnance's chief inspector at the London Road plant, who, if he believed the information to be accurate, signed the form and certified that the information was correct. (3) The form was sent to the headquarters of the Cleveland Ordnance District, where the request was reviewed by the chief inspector of the District, who made a recommendation. (4) The request was next forwarded to the ammunition center which had the technical responsibility for the contract, and the center made a recommendation respecting the approval or denial of the request. (5) The request was next submitted to the contracting officer, who made the final determination. A copy of the contracting officer's action was furnished to Affiliated, and a copy was also furnished to Army Ordnance's chief inspector at the London Road plant.

Most of the requests for deviations submitted by Affiliated were granted by Army Ordnance.

The various steps outlined above constituted a time-consuming process. A period of from 1½ to 2 months generally elapsed between the submission of a deviation request by Affiliated and the receipt of a copy of the contracting officer's decision on the request. In the meantime, the deviation shells were being held in Affiliated's Salvage Department awaiting final action.

Throughout the entire period of production, Affiliated encountered difficulty in attempting to meet, and generally was unable to meet, the delivery schedule. One reason was that the T–91 shell was, from the technical standpoint, a difficult shell to produce. Another factor was the inability of Affiliated, despite its experience and reasonable diligence in this respect, to secure a supplier or suppliers who could furnish forgings for the shells in the quantity and of the quality needed. The forgings obtained by Affiliated were apt to be marred by sharp edges and other rough places, and it was necessary to eliminate such defects by the process of grinding. Frequently the grinding caused shells to vary impermissibly from the requirements of the specifications as to wall thickness.

The permissible wall thickness was .03 of an inch, but this was later increased to .04 of an inch. If the wall thickness varied more than these amounts, the shell would not pass inspection. However, the departures from the allowable tolerance were generally slight, and it was customary for these shells to be considered as deviation shells, and the requests for deviations heretofore discussed were usually granted by Army Ordnance as to such shells.

Beginning in December 1952, when the London Road plant was engaged in production of T–91 shells under contract 131 and later under contract 506, certain supervisors, including the plant manager, who were employed by Affiliated at the London Road plant devised and carried out a scheme, referred to above, which in their thinking was designed to "cut red tape" and to assist Affiliated in its attempt to meet the delivery schedule. A few of the workmen who were employed by Affiliated at the London Road plant performed the manual labor involved in carrying out the plan.

The details of the plan were as follows: A few times each month and usually near the end of the month, after midnight when the second shift had completed its work and production for the day had ended, the persons involved in the plan would take deviation shells which were in the storage bins awaiting the preparation of a deviation request by Affiliated. They would eliminate the markings, place the shells with those which had passed inspection at CD–2, then remove an equal number of shells that had already passed inspection and place them with the deviation shells. The next day the previously inspected shells would be resubmitted for inspection at CD–2 under the guise of having been machined further to correct remedial defects. Naturally, these shells having passed once would pass again. All

these shells would then be passed on for final inspection at CD–3. The final inspection did not relate to factors for which inspection had been made at CD–2. The details of the substitution plan are more fully set out in finding 16.

None of Affiliated's officers participated in or were aware of the scheme until it was discovered by Army Ordnance.[2] Such officers cooperated fully in the investigation which followed.

The persons involved in the switching of shells were moved by a desire to assist Affiliated in meeting the delivery schedule. It took from 1½ to 2 months after request to get the so-called deviation shells examined and passed upon. They felt that these shells would have been accepted by Army Ordnance after they had been made the basis of deviation requests under the time-consuming procedure. In other words, they believed they were "cutting red tape."

Late in 1953, through an enterprising news reporter, defendant learned of the practice of substituting some of these shells and on October 30 ordered all production stopped.

The officers of the company, whom the proof does not show to have been involved in nor to have had knowledge of the substitution, asked for a conference to see if matters could be worked out in such a way as to enable the company to resume production of the shells.

On November 4, 1953, before scheduling a conference, the contracting officer communicated by long distance telephone with the Chief of the Industrial Division, Office of the Chief of Ordnance, Department of the Army, Washington, D. C. The Chief of the Industrial Division told the contracting officer there was no objection to the proposed discussion. However, he outlined to the contracting officer certain conditions which must be met before any approval would be grant-

ed for the resumption of production under contract 506, as follows:

"(1) it must appear that the top management of the company was not involved in the scheme that had led to the issuance of the stop order; (2) it would be necessary for Affiliated to discharge the persons who were involved in the scheme; and (3) it would be necessary for Affiliated to reimburse the Government for any damages that had been sustained." [Finding 20.]

A conference was held between the contracting officer and James A. Hughes of Affiliated at which the contracting officer outlined the above conditions as prerequisite to the granting of permission for the resumption of production under contract 506.

On November 17, 1953, the Chief of the Industrial Division, acting on behalf of the Chief of Ordnance, sent the contracting officer the following letter:

"1. Confirming conversation * * * on 4 November 1953, it is agreed that production may be reinstituted on Bryant Heater contracts provided the following conditions are met:

"a. Investigation discloses that top management of the parent company, Affiliated Gas Equipment Corp., is not in any way involved.

"b. Each individual who is shown to be involved is immediately removed from employment at the plant.

"c. The Bryant Heater Division accepts monetary responsibility for any excess costs incurred due to this incident involving the acceptance of non-conforming material.

"2. Notification should be furnished of action taken in accordance with the above." [Finding 22.]

---

2. Affiliated is a large manufacturing concern producing heating, air conditioning, and water heating equipment. It operates six plants which during the period in question employed some 3,000 persons.

The particular plant involved here was located in Cleveland, Ohio, where several hundred people were employed. (Tr. 41, 42, 43, and 44.)

Soon thereafter the contracting officer and Mr. Hughes had a further conference, at which the contracting officer informed Mr. Hughes of the receipt and contents of the above communication. Mr. Hughes informed the contracting officer that Affiliated was prepared to meet all the conditions outlined in the above letter of November 17, 1953.

The two men then discussed the sort of letter that might appropriately be sent to Affiliated by Army Ordnance for the purpose of authorizing the resumption of production under contract 506.

On November 24, 1953, the contracting officer submitted to the Office of the Chief of Ordnance a draft of a proposed letter authorizing resumption of production and the draft of a proposed news release. The covering communication was in part as follows:

"2. The proposed letter and news release are believed to be in compliance with * * * [the letter of November 17, 1953] and are designed to preserve the Government's present position completely while permitting the provisional resumption of production subject to whatever further action the Government may desire to take when it has received additional or final information or reports.

"3. The Government has a substantial investment in facilities at the plant, and approximately 500 people are unemployed during this shut-down. Representatives of this office were advised in your office last week that the Board of Inquiry is finding that the shells in question are safe for use and accurate within the designed purpose. The passage of time might enhance or create rights in the Company and react unfavorably against Ordnance.

"4. It is the opinion of this office that prompt action should be taken in accordance with the proposed letter and news release unless your office is in possession of information unknown to this office which would indicate otherwise.

This office will withhold further action in this regard until advice of your office has been received." [Finding 24.]

On December 1, 1953, the Chief of Ordnance forwarded to the Assistant Secretary of the Army the drafts mentioned above and a report on the reinspection of six carloads of shells previously delivered by Affiliated to Army Ordnance, discussed the results of inspection, and then stated:

"2. * * * In the absence of some unexpected development, it is not contemplated that shells which have been loaded, will be reinspected. The defects thus far discovered are not such as to endanger the safety of the troops.

"3. It is the recommendation of this office that Ordnance be authorized to continue this contract and to resume inspection under instant contract subject to the conditions hereafter stated. * * *" [Finding 25.]

In the expectation, in view of the previous letters and conferences, that the resumption of production under contract 506 would be authorized, confirmed by the statement of December 1, Affiliated restaffed the London Road plant with a new plant manager and supervisory personnel, and notified the forging suppliers to resume production on a limited basis. A test run of 600 shells through every operation was made to get statistical data and control charts on the machines producing each critical dimension. No doubt plaintiff's main reliance was based upon the conferences and the letters of November 17 and November 24, 1953, the first of which was sent to plaintiff by the Chief of the Industrial Division, Office of the Chief of Ordnance, and the second of which was prepared by the contracting officer in collaboration with Mr. Hughes of the plaintiff corporation, and submitted to the Chief of Ordnance together with a news release. Thereupon, the Chief of Ordnance made the statement of December 1, 1953, set out in finding 25.

The contracting officer reported to the Chief of Ordnance and the Chief of Ordnance wrote to the Assistant Secretary of the Army (Materiel), as set out in findings 27 and 28. There followed interdepartmental communications and meetings between various officials of defendant, as set out in findings 29 to 33, inclusive. In these communications, meetings, and discussions Affiliated had no part.

On December 29, 1953, the Army Ordnance sent Affiliated a letter cancelling contract 506 for statutory violation. See finding 34.

## DISCUSSION

In the tangled skein of facts and chaos of discussion and letters, it is difficult to weave anything other than a confused pattern. However, we think plaintiff was justified in securing a new staff on the assumption it would be permitted to resume production. The plaintiff agreed to meet the specified conditions and on December 1, 1953, it had every right to assume it was being authorized to resume operations. However, on December 29, 1953, plaintiff was notified that the entire contract was canceled under the fraudulent claims statute. (False Claims Act, 31 U.S.C. § 231.)

The letter or rather the statement made by the Chief of Ordnance, dated December 1, 1953, when linked with previous letters and conferences should be treated as an additional or supplemental agreement that authorized the plaintiff to prepare for and resume operations at least temporarily. Defendant at that time had all the facts in reference to the fraud charge and could have acted immediately. This was true even on November 24, 1953. It would be manifestly unfair for defendant to practically agree to such an arrangement, induce Affiliated to incur considerable new expense, and at the same time have lurking in the back of its mind the intention to cancel the whole contract, including the extra expense which the defendant had permitted and for practical purposes had authorized after full knowledge of the facts in connection wth the basis for final cancellation.

This is a most difficult case.[3] There is no doubt that a fraud was committed and fraud taints everything it touches. Fraud is a difficult thing to prove. It is impossible to look into the recesses of another's mind. Conclusions, usually, must be reached by a process of reasoning and the logic of analysis applied to facts and circumstances that are known or disclosed in the record. The lower animals act from knowledge and instinct. Human beings act from knowledge, reason, and belief. The dog knows and believes in his master whom he has seen. Man believes in the Creator whom he has not seen save as revealed in the genius and works of the Master Builder and in the perfection of natural law. This reasoning power is the primary difference between the brute and man. Sometimes the writer even wonders which has the advantage.

The defendant contends that by invoking the provisions of the fraudulent claims act it is entitled to forfeit all claims arising under the contract, and that the petition should be dismissed.[4]

3. The plaintiff cites numerous cases, Idaho Falls Bonded Produce and Supply Co. v. United States, 107 F.Supp. 952, 123 Ct.Cl. 842 (1952); Chemicals Recovery Co., Inc. v. United States, 103 F.Supp. 1012, 122 Ct.Cl. 166 (1952); Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952); Crovo v. United States, 100 Ct.Cl. 368 (1943); and W. H. Harrison Co., Inc. v. United States, 101 Ct.Cl. 413 (1944). There can be no quarrel with the principles enunciated in those cases, but when plaintiff undertakes to apply them to the facts of this case they are not persuasive in the determination of the final issues involved here.

4. The defendant cites many cases to the effect that a corporation is responsible for acts of its employees within the scope of its authority. United States v. United States Cartridge Co., 198 F.2d 456, 464 (8th Cir. 1952), cert. denied, 345 U.S. 910, 73 S.Ct. 645, 97 L.Ed. 1345 (1953); Gleason v. Seaboard Air Line Railway Co., 278 U.S. 349, 356–357, 49 S.Ct. 161, 73 L.Ed. 415 (1929); Ralston Purina Co.

Plaintiff, on the other hand, says (1) that fraud charges have been settled by agreement and payment and, therefore, further action is waived by defendant's accepting that settlement. This position we must reject for while it may have largely settled the damages and losses flowing directly from the substitution, it does not touch the provisions of the False Claims Act, which in conferences and letters defendant had reserved the right to invoke later and which as part and parcel of the Government's consent to be sued stipulates that any fraud or attempted fraud "in the proof, statement, establishment, or allowance" of a claim against the United States shall operate to forfeit the claim. (2) The plaintiff further says that the fraudulent claims statute covers only the acts in presenting and proving the claim and not the acts out of which the claim has grown. We are unwilling to apply such a narrow construction of the statute to the facts in this case.[5] In any event, not only did the plaintiff present unjust claims for uninspected shells, but for some 8 months secured payment therefor; a substantial part growing out of contract 506.[6] (3) Plaintiff contends that the cancellation was for the convenience of the Government, and that the reason was not the alleged fraud, but was due to the fact that the defendant no longer had need for the large number of these shells and that the latter was the real reason for the cancellation. It is possible that the declining need due to the slowing down of the Korean conflict might have helped to trigger the cancellation, but all along the defendant had reserved its legal and statutory rights and whatever its reasons may have been it still had those reserved rights.

In all its letters, the defendant made it clear that the arrangements for resuming production were subject to such action as defendant might decide to take and that the rights of neither party should be waived by the action taken.

This does not mean, however, that the defendant had the full right to delay this action and in the meantime to encourage Affiliated to restaff its plant and proceed with expenses incident to resuming production. The defendant had the full facts of the fraud as disclosed in its letter of November 24, and could have acted then. On the contrary, since it apparently needed the shells or thought it did at that time, it saw fit to conduct proceedings in such a way as to justify a conclusion that resumption of production by Affiliated would be authorized subject only to its meeting certain conditions which included a showing (1) that the top management of the parent company had not been in any way involved; (2) that each individual shown to be involved had been removed from employment at the plant; (3) that the Government should be paid for any excess costs due to the substitution incident. These conditions were met.

v. Novak, 111 F.2d 631, 636 (8th Cir. 1940); Ricketts v. Pennsylvania R. Co., 153 F.2d 757, 759, 164 A.L.R. 387 (2d Cir. 1946).

The defendant also cites the case of Little v. United States, 152 F.Supp. 84, 138 Ct.Cl. 773 (1957), as supporting its contention that the fraud of plaintiff precludes any recovery herein. However, Little is distinguishable from the facts of the present case in that in Little there was no supplemental agreement formed after the fraud was discovered, and that the plaintiff in Little was not induced to take action by the promise of the Government. Here, the plaintiff stopped production after receipt of the stop order and would not have incurred the additional expenses in absence of Government's promise to allow plaintiff to continue production.

See also Irwin & Leighton v. United States, 65 F.Supp. 800, 106 Ct.Cl. 398, 460 (1946).

5. Jerman v. United States, 96 Ct.Cl. 540 (1942); United States v. National Wholesalers, 236 F.2d 944 (9th Cir. 1956).

6. Little v. United States, 152 F.Supp. 84, 138 Ct.Cl. 773 (1957). There is little doubt that fraud may be waived by the party affected, but such waiver must be clear and specific. Here, there was no such waiver, even though there was unnecessary delay in taking final action.

This amounted to a supplemental agreement [7] or understanding, untouched by the issue of fraud, since it was made with full knowledge of whatever fraud was involved and after those facts were no longer in dispute. While the defendant's reservation of its right to cancel the contract for fraud would affect any claims growing out of the normal operations of the contract, the facts of this case do not justify a stretching of this right to cover the conduct and action of the parties during the period December 1 to December 29, 1953. The defendant was not justified in leading Affiliated to believe and, in effect, agreeing that it should provide new staffing for the London Road plant, reassemble its working force, and keep it in operating condition for resumption of production; and then almost immediately begin interdepartmental huddles, meetings, and discussions to determine the best way to cancel the contract. In the interim the defendant's officials continued to discuss ways and means of canceling the entire contract, while the plaintiff incurred additional needless expense without its being advised of the nature of the discussion. While the decision was reached on December 16, plaintiff was not notified until December 29.

This contract was with the Ordnance Corps of the Department of the Army. All the matters were handled through that Department and its affiliated divisions. On November 4, 1953, the contracting officer communicated by long distance telephone with the Chief of the Industrial Division, Office of the Chief of Ordnance, Department of the Army, Washington, D. C., and further advised him of the substituted shells, and discussed with him the question of conditions under which production could be resumed.

On November 17, 1953, the Chief of the Industrial Division, acting on behalf of the Chief of Ordnance, sent to the contracting officer a communication stating that it was agreed that production could be reinstituted if three conditions were met. The plaintiff agreed to meet these conditions.

According to the procedure in effect within the Department of the Army, a contracting officer was required to report promptly to the Chief of Ordnance any situation that seemed to involve fraud in connection with an Army contract. The Chief of Ordnance *was required to forward the report to the Assistant Secretary of the Army,* who was vested with the final authority to determine the action that should be taken. Such a report concerning the substitutions heretofore referred to was prepared by the contracting officer in charge of contract 506, "and was transmitted through channels to the Assistant Secretary of the Army." (Finding 18.)

It is impossible to escape the conclusion that the Secretary of the Army knew all about this alleged fraud early in November 1953, and that he was thoroughly familiar with the negotiations that were going on by the various officials of the defendant who were conducting the operations as well as the negotiations. We have not the slightest doubt that the Assistant Secretary of the Army was thoroughly familiar with practically all the steps in the procedure that was being conducted. In fact, the record does not show that he ever denied such knowledge.

 Under the authorities, of course, the defendant is bound by the actions of its officers only when they are acting within the scope of their authority. But in practical application, in conducting the affairs of this broad, big country much of this authority must be delegated. We are convinced that the Assistant Secretary of the Army, having been notified in the very beginning through a report of the substitution of the shells, was compelled to know by the logics of events what was going on. Anyone who ever sat by even a dimly lit torch of reason must, it seems to us, be driven inexorably to the conclusion that he knew all the essential facts not later than November 24, 1953. Fraud is somewhat

7. Nourse, Jr., Assignee v. United States, 25 Ct.Cl. 7 (1889).

unusual in the operation of public and private contracts. When such an issue is raised, therefore, it naturally attracts attention. It was the duty of the contracting officer to report promptly to the Chief of Ordnance any situation that seemed to involve fraud. The Chief of Ordnance was required to forward the report to the Assistant Secretary of the Army who had authority to take action. Such a report was transferred to the Assistant Secretary of the Army early in November. (Finding 18.)

In the facts and circumstances revealed here we cannot believe the Assistant Secretary of the Army was not familiar with the steps that were being taken. To attempt to reach any such conclusion under the facts of this case is enough to bulge the crown sheet of anyone's thinking capacity. It simply did not happen, that's all. The record in this case precludes any other reasonable conclusion than that the Assistant Secretary of the Army knew all about what was going on, at least early in November 1953, and no doubt approved of the negotiation. The law is not a cold and inanimate object. It is a living thing. There is no such thing as justice except as applied to human beings. The law is not necessarily separated from justice. The two should at least be allowed to live in the same neighborhood.

All of the cases cited by the defendant on the question of authority of officials to act are distinguishable on their facts from the instant case. When the Assistant Secretary of the Army had all the facts before him, we think it would be cruel, unjust, and unfair for him to delay final action while the plaintiff was incurring worse than useless expense. Whatever equity is applicable here flows directly from the contract itself and is woven into the warp and woof of its provisions.

We find that the plaintiff is entitled to recover the cost and expenses of the operation from December 1, 1953, to December 29, 1953, including the cost of reassembling its working force and its standby expense, but that its recovery should be thus limited. These expenses would not have been incurred had defendant acted with reasonable promptness after the full facts were made known.

Notwithstanding the complications and close interpretation of the disputed issues involved in this unusual and complex case, we believe we have reached a conclusion that is fair to both sides.

We have not discussed the alleged failure to exhaust administrative remedies because the situation does not call for it. There was no cancellation for default and no decision was made by the contracting officer. In addition, the issue is a question of law, rather than one of fact.

The plaintiff is entitled to recover on the basis indicated. The amount of recovery in the absence of an agreement on the part of the respective parties will be referred to the commissioner for determination under Rule 38(c).

LARAMORE, Judge (concurring).

I concur with the majority's conclusion that plaintiff should recover on the basis of the majority opinion. I also concur with the majority that a supplemental agreement resulted. However, I would prefer that plaintiff's damages should be measured under the clause of the contract which provides for a termination for the convenience of the Government. This is in accordance with my concurring opinion in the cases of John Reiner & Company v. United States, Ct.Cl., 325 F. 2d 438, 1963 and Brown & Son Electric Company v. United States, Ct.Cl., 325 F.2d 446, 1963.

WHITAKER, Judge (concurring in part and dissenting in part).

This is a fraud case the like of which I have never before encountered. Unlike any other one, my sympathies are with those whose agents perpetrated the fraud, and yet I do not think they are legally entitled to what the majority proposes to give them.

The officers and agents of the plaintiff on the managerial level took no part in the commission of the fraudulent acts. They did not induce them; they had no knowledge that they would be committed.

As soon as they learned of them, they sought to purge the company of the fraud to the full satisfaction of the Government. They have reimbursed the Government for all that it has suffered on account of the fraud, and stand ready to comply with all else the Government requires of them.

In an effort to secure permission for a resumption of production under the contract, they had a number of conferences with the Contracting Officer, the person who had been authorized to represent the Government in the carrying out of the contract. The Contracting Officer outlined certain conditions which he thought it would be necessary for the plaintiff to fulfill as a condition of the grant of permission to continue with the contract. He, however, informed the plaintiff that in fraud matters it would be necessary for him to get the concurrence of "Washington" before he could make any binding commitment, but he did not designate the official in Washington whose concurrence would be necessary.

After the Contracting Officer and a representative of the Chief of Ordnance in Washington had informally agreed over the phone on the conditions with which it would be necessary for the plaintiff to comply, the Chief of the Industrial Division, acting for the Chief of Ordnance, wrote the Contracting Officer confirming the prior telephonic conversation and stating that the contract might be continued upon the fulfillment of conditions which he set out. Thereafter, after the Contracting Officer, in a further conference with plaintiff's representative, a Mr. Hughes, had told him of the contents of the letter from the Office of the Chief of Ordnance, he was informed by Mr. Hughes that the plaintiff was prepared to meet all of those conditions.

Nothing was said in this conference about the necessity of securing the concurrence of the Assistant Secretary of the Army.

Now I understand that Judge DAVIS' dissent is based upon a requirement of the regulations that the settlement of any fraud case must be approved by the Secretary or the Assistant Secretary for Materiel, that the plaintiff was charged with knowledge of this, and since the Assistant Secretary refused to approve it, it was not binding. There is no doubt about the fact that anyone who deals with a Government agent must, at his peril, ascertain the authority of that agent. This is an exception to the rule that a person is entitled to rely upon the apparent authority of the agent. That rule was grounded on right and justice. It is not applied to Government agents because of the necessity of protecting the people from their unauthorized acts, but whenever the Government is exempted from the apparent authority rule, someone suffers. I shrink from applying it here. The Contracting Officer was authorized by the Government to represent it in the performance of this contract; the Government had unequivocally held out to the plaintiff that he had such authority. The plaintiff had no reason to suspect that he lacked authority in the circumstances of this case except for the statement of the Contracting Officer that he could not make any binding commitment without the concurrence of "Washington." But, when the Contracting Officer came back to the plaintiff and informed it that he had communicated with "Washington" and that "Washington" had stated that the plaintiff would be permitted to continue with the contract upon compliance with the conditions which he set out in his letter, the plaintiff would seem to have been entitled to rely upon this representation of the Government's representative charged with the duty of supervising the performance of this contract. It would seem that if the concurrence of any other official in Washington was necessary, the Government's representative in charge of the performance of the contract was under the duty to so inform the plaintiff, and he did not do so.

Now it is true that the regulations provided that the concurrence of the Assistant Secretary was required but I am loathe to believe that the plaintiff was duty bound to pore through the volumi-

nous Army regulations to verify the Contracting Officer's implied assurance that he had secured the concurrence of those whose concurrence was necessary. I think the Government's representative misled the plaintiff. He, no doubt innocently, beguiled plaintiff into believing all had been done that needed to be done; he lulled it to sleep; he never questioned the sufficiency of the concurrence of the Chief of Ordnance. In such case I shrink from making the customary exemption of the Government.

But for another reason I do not think plaintiff is entitled to what the majority proposes to give it. The majority opinion states that after the Contracting Officer had advised plaintiff's representative of the conditions upon which it might resume production under the contract, "the two men then discussed the sort of letter that might appropriately be sent to Affiliated by Army Ordnance for the purpose of authorizing resumption of production under contract 506." The money expended by plaintiff, for which the majority proposes to reimburse it, was spent before receipt of this letter. No such letter, in fact, was ever sent plaintiff. Therefore, whatever plaintiff did before receipt of that letter, it did so at its own risk and, since "Washington" decided not to send such a letter at all, plaintiff is not entitled to recover.

For these reasons, I must respectfully dissent.

DAVIS, Judge (concurring in part and dissenting in part).

Affiliated broke the contract when its plant manager and other employees deliberately by-passed the defendant's inspection system and palmed off rejected shells as though the inferior goods had met the Government's test. This was a deliberate and serious fraud on the Government, materially breaching the agreement and subjecting Affiliated to cancellation for default. Only in the rarest of cases could a serious fraud fail to be a substantial breach; in this instance the materiality of the breach seems patent.[8] Nor is it an excuse that the company's higher officers were wholly innocent of the misrepresentation and the breach. The contractor is tarred by its operating employees' conduct under the contract, just as it would be held liable if they had made poor shells or failed to produce the required number. See Gleason v. Seaboard Air Line Ry. Co., 278 U.S. 349, 355–357, 49 S.Ct. 161, 73 L.Ed. 415 (1929); United States v. United States Cartridge Co., 198 F.2d 456, 464 (C.A.8, 1952), cert. denied, 345 U.S. 910, (1953); United States v. George F. Fish, Inc., 154 F.2d 798, 801 (C.A.2), cert. denied, 328 U.S. 869, 66 S.Ct. 1377, 90 L.Ed. 1639, 73 S.Ct. 645, 97 L.Ed. 1345 (1946); Ricketts v. Pennsylvania R. Co., 153 F.2d 757, 759, 164 A.L.R. 387 (C.A.2, 1946).

The central question, to me, is whether the defendant waived the breach. The record suggests that the Ordnance Department, both in the field and in Washington, initially desired to waive the breach and to continue production under the contracts, provided that Affiliated met the conditions stated in finding 22. If Ordnance had the authority to overlook the violation, I would find it hard to deny that it effectively did so through its letter of November 17, 1953, and the ensuing actions between that date and the end of the month (findings 22–24). Ordnance imposed specific conditions for resumption; the contractor agreed without qualification. That may very well have been enough to reinstate the contract—if Ordnance had that power. See Freedman v. United States, Ct.Cl., 1963, 320 F.2d 359, 363–64.[9]

---

8. Plaintiff paid the defendant a settlement of $127,283, including $60,000 under the False Claims Act as "damages for breach of contract and for damages and forfeitures under the False Claims Act." The parties agreed, however, that the settlement should be without prejudice to plaintiff's claims with respect to the cancellation of the contract for cause. See finding 39.

9. Later, Ordnance seems to have considered it unnecessary to resume operations in view of the decrease in the need for the shells.

Plaintiff's theory of a consummated agreement-waiving-the-breach founders, however, on the jagged coast of lack-of-authority. Neither the Ordnance contracting officer nor the Chief of Ordnance was empowered to disregard the breach or to reinstate the contract. At that time, there was in effect within the Department of the Army a procedure under which any situation seeming to involve fraud in connection with an Army contract had to be forwarded by the chief of the technical service (i. e., Ordnance) to the Assistant Secretary of the Army (Materiel), who was vested with final authority to determine the action which should be taken. See finding 18. That rule operated to deprive the Chief of Ordnance of power to make the agreement to which plaintiff refers. Among the most ancient of the principles of federal procurement is that the Government is not bound by the agreement of an agent or officer without *actual* authority —even though he would be held to have apparent authority if the private law of agency controlled.[10] The contractor has the burden of discovering the true extent of the authority of the Government men with whom he deals.

Affiliated did not know (it appears) that final power to reinstate the contract had been withheld from the Ordnance Department, but the rule of actual authority has never been confined to contractors who knowingly make agreements with unauthorized officers. Moreover, the contractor here was not unaware that there was a problem of authority. Its representative was early told that the final decision on whether Affiliated would be permitted to resume production under the contract would be made "in Washington" (finding 21). The matter was plainly beyond the contracting officer's sphere; and Affiliated so understood. The phrase "in Washington" may have meant the Office of the Chief of Ordnance, but it may also have referred to a higher echelon within the Army or the Defense Department; at the least, Affiliated was put on notice that someone at the Seat of Government would have the final word. So far as we know, the contractor did not seek to discover what officer "in Washington" had that power. Plaintiff assumed, without inquiry, that it was enough to obtain the concurrence of the Office of the Chief of Ordnance. Now that that assumption has turned out to be invalid under the Army's procedure, plaintiff necessarily finds itself relying on an asserted agreement with a level of the Department of the Army which was not authorized to act where fraud was suspected.

Harsh though the rule of actual authority may sometimes seem, it serves important ends in a case like this. The Department of the Army evidently thought that fraud in procurement required the attention of the next-to-highest echelon in the agency, on the Secretarial level. The procuring services were not to be free to decide for themselves whether the contract should be reinstated or the breach waived. Those services are often preoccupied with a pressing need for the supplies, and less concerned with the overall considerations of general policy which the Department must have thought should govern fraud cases. Departmental rules and policies are to be vindicated in procurement as in other fields. See G. L. Christian & Associates v. United States, Ct.Cl., 1963, 320 F.2d 345, cert. denied, 84 S.Ct. 444, 1963. It is important that "procurement policies set by higher authority not be avoided or evaded (deliberately or negligently) by lesser officials, or by a concert of contractor and contracting officer." 320 F.2d at 351. To permit this contractor to stand on an agreement-to-resume made with Ordnance, in the teeth of the requirement that the Assistant Secretary pass upon that very question, would fail "to protect the significant policies of superior

---

10. Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947); United States v. Stewart, 311 U.S. 60, 70, 61 S.Ct. 102, 85 L.Ed. 40 (1940); Sutton v. United States, 256 U.S. 575, 41 S.Ct. 563, 65 L.Ed. 1099 (1921); Whiteside v. United States, 93 U.S. 247, 256–257, 23 L.Ed. 882 (1876).

administrators from sapping by subordinates." Ibid.

It remains to say, on this point, that there is nothing in the record or the recommended findings to indicate that the Assistant Secretary actually knew or approved of any agreement between Ordnance and Affiliated to resume production (or to prepare to resume production). Nor, in view of his manifold duties and responsibilities, is there reason to believe that the Assistant Secretary was (or should have been) fully cognizant—before he came to consider and decide the matter in the middle of December 1953— of Ordnance's dealings with this particular company on this contract from the time the fraud was discovered at the end of October 1953.[11] In any event, the Assistant Secretary certainly cannot be said to have ratified any agreement between Ordnance and the contractor in November 1953. It was not until December 1, 1953 that the Chief of Ordnance made his *recommendation* to the Assistant Secretary to continue the contract under specified conditions; that recommendation evidently assumed that approval had not yet been given.

The Assistant Secretary thereafter acted with reasonable promptness in a case of this kind. He refused to reinstate the contract and ordered it cancelled for default. He determined, on December 16, 1953, that "the contract will be terminated, for default if the legal basis may be found" and that "Ordnance will take immediate steps to re-move the production line from the plant and place it in storage" (finding 30). The formal letter sent to Affiliated on December 29, 1953, stated, after a reference to the fraud, that "by reason of such contract and statutory violations, you are advised that the contract is canceled" (finding 34). It is true that this letter avoided using the term "default," and that Affiliated was told by Army representatives, shortly thereafter, that the letter "left open for a final determination the default, repudiation, or termination for the convenience of the Government of the contract" (finding 35). But it is clear to me, particularly from the testimony of the Assistant Secretary and the Assistant Judge Advocate General,[12] that the former definitely intended to terminate the contract for default—not to reinstate it, or to end it for the defendant's convenience. Since Affiliated had actually defaulted, the Secretary's subjective purpose is consistent with his written determination that the contract was to be terminated for default "if the legal basis may be found," as well as with the formal declaration to Affiliated (on December 29th) that "by reason of such contract[ual] and statutory violations, you are advised that the contract is canceled." If the contractor was momentarily soothed into giving these words less than their face value, it soon became clear that the defendant deemed the contract ended—and not for the Government's convenience or because of the Government's fault.

11. The findings make it clear that there was to be an investigation by Ordnance and consultations with the Department of Justice before any final decision was made. There is no adequate ground for saying that the Assistant Secretary followed, or should have followed, all these various steps until the time came for his determination. It is normal for an official of his echelon to await the presentation of all the data and recommendations before undertaking his own consideration. In the light of all the circumstances, there is likewise no adequate ground for saying that the consideration of what should be done with Affiliated's contract, after the fraud was discovered, was unduly delayed by Ordnance. Almost immediately after the Assistant Secretary's decision of December 16, Ordnance withdrew its conditional offer of November 17 (see finding 31).

12. As defendant requests, the findings should contain the substance of the testimony of the Assistant Judge Advocate General and the stipulation that the Assistant Secretary would give essentially the same testimony. This evidence was that the Assistant Secretary put aside all considerations relating to increased capacity or reduced requirements for the shells and directed that the contract be ended on the basis of the contractor's contractual violations and fraudulent actions.

It follows, in my opinion, that plaintiff is entitled to recover nothing on account of the termination of the contract. The agreement was cancelled for a default which had actually occurred. To the extent that the court refuses the recovery plaintiff seeks, I concur in the judgment.[13]

I do not concur, however, with the majority when it finds a separate, supplemental agreement to reimburse plaintiff for Affiliated's costs incurred, during December 1953, in meeting the conditions specified by the Ordnance Department in its letter of November 17th. There could be no such supplemental agreement with Ordnance for the same reason there could be no valid agreement to reinstate the main contract; the rule which vested the Assistant Secretary with final authority in fraud cases deprived Ordnance of all power to bind the United States to pay Affiliated for rearranging its plant and operations to accommodate a prospective resumption of operations. There is, in addition, no evidence that either party considered that it was entering into a *supplemental* pact. No such agreement was formally made and there is no course of dealings from which a contract implied-in-fact could be inferred. It appears, rather, that Affiliated was so certain that the production contract would be reinstated that it undertook these expenses in the confident expectation that they would not be for naught, or Affiliated may well have felt (as it now argues) that it had already obtained an agreement to reinstate the shell contract. Ordnance seems to have been of a similar mind. Both the contractor and the agency failed to take account of the significant role of the Assistant Secretary. Affiliated was probably unaware of his participation; in November and early December, Ordnance apparently anticipated his certain approval of a continuation of the contract. Cf. Congress Constr. Corp. v. United States, Ct.Cl., 1963, 314 F.2d 527, cert. denied, 375 U.S. 817, 84 S.Ct. 53, 11 L. Ed.2d 52.

Perhaps if we could utilize the broad concepts of fairness, grace, and "equity" which have sometimes characterized our Congressional reference cases of the past, we would hold that plaintiff should be compensated for Affiliated's out-of-pocket expenditures in reliance on what Ordnance told it in November 1953. But this is a case, presented and tried under our general jurisdiction, in which we can grant judgment only on a claim known to the law. In my view, the demand which the court satisfies with a judgment is not a legal claim which we should recognize as such. I would allow no recovery.

13. Since I believe that Affiliated materially breached its contract which was then properly terminated for default, I do not reach the independent question of whether plaintiff is also barred from recovery by 28 U.S.C. § 2514. But it is implicit in my position that Affiliated should have pursued its administrative remedy, before the Board of Contract Appeals, to have the default termination set aside. Its failure in this respect is a further bar to recovery. United States v. Blair, 321 U.S. 730, 64 S.Ct. 820, 88 L.Ed. 1039 (1944); United States v. Joseph A. Holpuch Co., 328 U.S. 234, 66 S.Ct. 1000, 90 L.Ed. 1192 (1946).